## Mountain Water Supply Co. et al. v. Sagamore Coal Co. et al.

*Mines and mining — Streams — Waters — Damages — Damnum absque injuria—Negligence—Malice—Avoidable injury.*

1. The general proposition laid down in Pennsylvania Coal Co. *v.* Sanderson, 113 Pa. 126, that "every man has the right to the natural use and enjoyment of his own property, and if while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria,*" has not been changed or altered, although some of the later cases explain more in detail what is meant by the words "an unavoidable loss" as used by Mr. Justice Clark in his opinion in the Sanderson case.

2. The owner of land in a watershed has certain rights in the streams which constitute its natural drainage, which are property inherent in and appurtenant to the ownership of the land, among which is the right to permit water to flow by gravity into the streams from openings made in the land for the mining of coal, subject only to three limitations: (1) It must be done without malice; (2) it must be done without negligence; and (3) it may not be done if an avoidable loss and damage thereby will be inflicted upon another's property.

3. The injury is avoidable if it be preventable by a reasonable expenditure of money. If the expense of preventing the damage from the contemplated act is such as practically to counter-balance the expected profit or benefit, then it is clearly unreasonable and beyond what the party justly can be called upon to assume. If, on the other hand, however large in actual amount, it is small in proportion to the gain to himself, it is reasonable in regard to his neighbor's rights. Between these two extremes lies a debatable region where the cases must stand on their own facts, under the only general rule that can be laid down in advance, that if the expense required will so detract from the purpose and benefit of the contemplated act as to be a substantial deprivation of the right to the use of one's own property, the result will be *damnum absque injuria.*

*Corporations — Chartered powers — Doubtful powers — Construction of charter.*

4. A corporation has no natural rights. Its powers are to be determined from what appears on the face of its charter and the language of the legislation authorizing its formation. The test is not what it has done or what it may attempt to do, but what it is authorized to do and may be compelled to do under its charter. There can be no authority or power conferred upon a corporation by its certificate of incorporation or letters-patent, except such as are clearly given by, or necessarily implied from, the language of the statute under which the charter is granted. A doubtful power does not exist, because whatever is doubtful is decisively certain against the corporation.

*Corporations—Water companies—Eminent domain—Public companies—Private companies—Powers—Riparian owners—Waters—Pollution—Sulphur water — Equity — Injunction—Private and public rights—Acts of April 29, 1874, and May 16, 1889.*

5. A water company created under clause ix of section 2 of the second class of corporations mentioned in the General Corporation Act of April 29, 1874, P. L. 73, as amended by the Act of May 16, 1889, P. L. 226, for "the supply of water to the public, or the supply, storage or transportation of water and water power for commercial and manufacturing purposes," is a corporation for a public use, invested with the power of eminent domain, while a water company created under clause xviii of section 2 of the second class of corporations mentioned in said General Corporation Act of April 29, 1874, P. L. 73, as amended by the Act of May 21, 1889, P. L. 259, providing for the incorporation of companies for various purposes, including companies "for the storage, transportation and furnishing of water, with the right to take rivulets and land, and erect reservoirs for holding water, for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom," is a corporation for a private purpose, not enjoying the right of eminent domain.

6. The legal status of a water company of either kind, taking and impounding water from a stream, not in the exercise of a power of eminent domain, and without having made or secured compensation to riparian owners above the impounding reservoir, is simply that of a riparian owner, limited in its own use of the water

to ordinary domestic purposes, without right to divert and carry it out of its channel and supply it at distant points for domestic or industrial purposes, and such water company is without standing to enjoin the operators of coal mines above the impounding reservoir from draining the sulphur water from their mines into the stream which constitutes the natural drainage of the basin in which the mines are situate, thereby polluting the water and rendering it unfit for the uses to which the water company has been devoting it.

7. Unless there has been a legal condemnation of the waters of a stream by a water company invested with the power of eminent domain, and a dedication of the waters thereby to a public use, the Commonwealth has no interest which affords it a right to maintain a bill to enjoin coal operators above an impounding reservoir from draining their mine waters into the stream. If the public have a right to receive pure water through the agency of a corporation legally authorized to take it from a stream, those who pollute it with water from their coal mines offend against the public. If, on the other hand, the waters of a stream, in which riparian owners alone have an interest, be polluted with waters from coal mines, the wrong or injury is a private one, for which the riparian owner may have redress, and this is true whether the riparian owner be a private person or a water company which does not take the water from the stream under the right of eminent domain. The rights of such owners are the same. The wrong in such a case, if any, is to the riparian owner, in depriving him or it of the use of pure water for ordinary domestic purposes.

8. The prayer of a bill will be refused and the bill will be dismissed where it is sought to restrain the operators of coal mines along a stream of water, which constitutes the natural drainage of the watershed in which the mines are situate, from draining the waters from their mines into the stream which enters an impounding reservoir erected by a water company, not in the exercise of the power of eminent domain, and which, therefore, has but the rights of an ordinary riparian owner, but which is not using the water taken from the stream for the ordinary domestic purposes of a riparian owner, where it is shown by the evidence that to require the operators of the mines to remove the sulphuric acid from the mine water before it reaches and commingles with the waters of the stream would require of them an unreasonable expenditure, resulting in a closing of the mines, and practically a loss to defendants of their coal properties.

Bill in equity for an injunction. C. P. Fayette Co., No. 1023, in Equity.

Gaither, Portser & McConnell, Smith & Best, Playford & Phillips and Sturgis, Morrow & Sturgis, for plaintiffs.

William I. Swope, Deputy Attorney-General, for Commonwealth.

Reed, Smith, Shaw & Beal, Sterling, Highbee & Matthews, Crow, Shelby & Tabor, McDonald & Cray, Umbel, Robinson, McKean & Williams, Uhl & Ealy, Graham & Yost, John S. Brooks, Jr., Samuel A. Gilmore, John S. Christy, Joseph W. Ray, Jr., F. E. Younkin, William Banks and W. D. N. Rogers, for defendants.

VAN SWEARINGEN, P. J., Dec. 26, 1922.—The history of this litigation began March 2, 1920, when plaintiffs, the Mountain Water Supply Company, the Dunbar Water Supply Company and the Pennsylvania Railroad Company, filed a bill in equity in this court against the Melcroft Coal Company, one of the defendants, containing allegations somewhat similar to the allegations in the present bill. Soon thereafter separate bills of like nature were filed against others of the present defendants. On Nov. 26, 1920, the Westmoreland Water Company petitioned the court for leave to intervene as a party plaintiff, which was refused: Mountain Water Supply Co. et al. v. Melcroft Coal Co., 30 Dist. R. 971, 69 Pitts. L. J. 245. On Jan. 24, 1922, on petition of the Attorney-General, the Commonwealth of Pennsylvania was permitted to intervene as a party plaintiff in the cause: Mountain Water Supply Co. et al. v. Melcroft Coal Co., 1 D. & C. 660, 70 Pitts. L. J. 123. On April 12, 1921, the present bill was filed by the three original plaintiffs against the twenty-nine defendants jointly. Later a joint and several demurrer of the defend-

3 D. & C.

DISTRICT AND COUNTY REPORTS. 189

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

ants to the bill was overruled and dismissed: Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al., 1 D. & C. 631, 70 Pitts. L. J. 129. Before the trial the Commonwealth of Pennsylvania was permitted to intervene as a party plaintiff in this suit.

About sixteen years ago the plaintiff water companies and railroad company, through their agents and contractors, constructed a large dam or reservoir in Fayette County, Pennsylvania, on a mountain stream known as Indian Creek, which flows down what is called the Indian Creek Valley, and since that time, through other water facilities so constructed by them, have been making use of water from the impounding reservoir mentioned, which has a capacity of 251,000,000 gallons. The defendants are individual, partnership or corporation coal owners, having open and in operation coal mines on either side of the stream in the watershed or drainage basin of the Indian Creek Valley, from which mines large quantities of water, contaminated with sulphuric acid, drain from the pit-mouths by gravity over lands of defendants into the waters of Indian Creek above the dam or reservoir of plaintiffs. It is alleged by plaintiffs in their bill that the mine waters flowing from the mines of defendants into Indian Creek have become so highly charged with sulphuric acid as to greatly endanger the waters of the stream reaching the impounding reservoir of plaintiffs, and that if defendants be permitted to continue to drain their mine waters into Indian Creek as their mines are further developed, the waters of Indian Creek will be destroyed for the uses to which plaintiffs have been devoting them. The prayer of the bill, therefore, is: "That an injunction be granted restraining the defendants, and each of them, from discharging, pumping, or causing, or permitting to flow, or to be discharged, any drainage of mine water from the said mines, and from the mine or mines of each, into the waters of Indian Creek, or its tributaries, in the County of Fayette, State of Pennsylvania."

Counsel for defendants in their brief state their case thus: "The act and thing sought to be enjoined is a right of property, of which defendants cannot be deprived except by due process of law, and this injunction must be refused unless plaintiffs possess and have exercised rights and powers superior to those of ordinary riparian owners;" which statement, counsel say, naturally requires consideration of these two propositions:

"(1) The act and thing sought to be enjoined is a right of property, of which defendants cannot be deprived except by due process of law.

"(2) Plaintiffs' rights, as shown by this record, are not superior to those of ordinary riparian owners, and defendants have not been deprived of their property by due process of law."

While we think we were right in refusing the Westmoreland Water Company permission to intervene as a party plaintiff, under the facts as then developed, we might as well have granted that permission, because, on April 5, 1922, that company filed a bill, wherein it alleged many of the same things contained in the bill in the present case, and some others, and made the same prayer for relief that is made here, except that it went a little further and asked that the defendants be restrained from emptying their mine water into Indian Creek or its tributaries, "at a point or points on said streams where the said mine water, or any of it, may reach the masonry dam maintained by the Mountain Water Supply Company on said stream, from which your orator receives a supply of water for the use of the public in the municipal districts or divisions of Westmoreland County included within its charter rights," and the two cases practically were tried together. The respective parties were

represented by the same counsel, and as soon as the present case was concluded, it was agreed by counsel that, to the extent applicable, the evidence in this case should be taken as the evidence in the other case, and with a few formal offers that case also was closed. The two cases were argued together, the briefs of counsel cover both, and the requests for findings of fact and conclusions of law, in so far as applicable, are the same. We, therefore, shall cover both cases in this opinion, although formal requests for findings of fact and conclusions of law and formal answers thereto will be filed there, and we shall make the same decree there that is made here.

Owing to the peculiar nature of the controversies involved and the interlocking character of the questions of law and fact, we deem it advisable in a few instances, as we go along, to give the legal reasons why we find the facts as we do. This will be followed, after the findings of fact are completed, with a discussion of the more important questions at issue, with formal conclusions of law immediately preceding the decree. From all the evidence before us, we find the material and important facts to be as follows:

### Findings of fact.

1. Indian Creek is a non-navigable stream, having its source in Donegal Township, Westmoreland County, Pennsylvania, and flows in a general southwesterly direction, through Saltlick and Springfield Townships, in Fayette County, between the Laurel ridge of mountains on the east and the Chestnut ridge on the west, a distance of approximately twenty-two miles, and empties into the Youghiogheny River in Fayette County, ten miles above the City of Connellsville. It drains a valley or watershed twenty-two miles in length, and of an average width of nine miles. The entire drainage area of the valley is approximately 130 square miles.

2. The Indian Creek watershed originally was an ordinary neighborhood, consisting of farms, woodlands, mountain sides and a few villages of the character generally found in rural communities. Prior to 1912 the watershed was sparsely inhabited, the population of the entire drainage area of 130 square miles not exceeding 2500. A large part of the land was covered with scrub timber, and the inhabitants of the valley were engaged almost exclusively in agricultural pursuits, although country coal mines have been opened and operated in a small way for many years. The waters of Indian Creek then were reasonably pure and were well adapted for domestic uses and for steam purposes. Since the development of the coal industry, mining towns have sprung into existence. There are now about 1200 permanent habitations in the watershed, and the present population is from 6000 to 6500.

3. The Indian Creek Valley contains all the seams of the lower productive measures of bituminous coal. These measures are the A or Clarion, B or Lower Kittanning, C or Middle Kittanning, C-Prime or Upper Kittanning, D or Lower Freeport, and E or Upper Freeport. Only two of these seams now are operated in the Indian Creek Valley, the B and the C-Prime. The B or Lower Kittanning seam, which is the seam most extensively worked at this time, runs from three feet to fifty-eight inches in thickness, averaging about three and a half feet.

4. Underlying the land within the drainage area of Indian Creek there are approximately 43,000 acres of that vein or seam of coal known as the Lower Kittanning seam, the trough or basin of which in location approximates the channel of Indian Creek. Practically all of this coal lies on a higher level than the waters of the stream. A part of the drainage area also is underlaid

3 D. & C.

with the Lower Freeport vein, which is to be found on a higher level than the Lower Kittanning vein.

5. The coal in the Indian Creek Valley is a good grade low volatile steam coal, well known in the markets and readily salable. It is in direct competition with like coals produced elsewhere in Pennsylvania and in West Virginia and Maryland.

6. The defendants in this case were all of the individuals, firms or corporations engaged in the mining of coal and in the shipment of the same by rail at the time of the filing of the bill in this case, they are the owners or lessees of approximately 21,000 acres of the coal of the Lower Kittanning measure, and most of them are engaged in conducting mining operations therein, although a few are engaged in mining the coal from the upper measure known as the Lower Freeport seam.

7. The mines of the defendants along Indian Creek are on either side of the stream.

8. Coal mining has been going on in Indian Creek Valley for fifty years. In 1902 and 1903 there were forty or fifty country coal mines in operation, the coal being handled by wagon for local consumption in the neighborhood.

9. Many of the present mines operate the same coal and are in the same, or substantially the same, locations as mines which were in operation in 1902 and 1903, and for many years prior thereto.

10. The coal owned or under lease by defendants is of an aggregate value of about $2,000,000. The replacement value of the defendants' improvements for the mining of this coal aggregates in excess of $1,450,000.

11. The Sagamore Coal Company owns about 1100 acres of coal in the Indian Creek Valley. Its mining improvements represent a cash investment of $175,000.

12. The Melcroft Coal Company has under lease about 6000 acres. Its mining improvements represent a replacement value in excess of $600,000.

13. The Indian Creek Coal and Coke Company owns about 9500 acres. Its mining improvements represent a replacement value of $200,000.

14. The other defendants have smaller acreages of proportionate values.

15. At the time of the construction of the dam of the Mountain Water Supply Company there were no railroad facilities in the Indian Creek Valley. In 1907 the first section of a railroad was built, extending from the tracks of the Baltimore & Ohio Railroad Company, which parallel the Youghiogheny River for a distance of four or five miles, to a point near the dam of the water company. In 1908 the railroad was extended to a point in the Indian Creek Valley known as Rogers Mills, and in 1910 further extended to Jones Mills.

16. The first coal shipped by rail came from the mine now operated by the Rogers Coal Company, one of the defendants. The total tonnage of coal shipped by rail from the Indian Creek Valley prior to 1914 approximated 15,800 tons, in the aggregate the coal mined from about three acres of the land. During the year 1914, 40,100 tons were shipped; during the year 1915, 18,200 tons; during the year 1916, 42,100 tons; during the year 1917, 121,200 tons; during the year 1918, 181,500 tons; during the year 1919, 255,700 tons; during the year 1920, 254,900 tons; during the year 1921, 309,600 tons; and during the first six months of the calendar year 1922, the shipments exceeded the entire tonnage for the preceding calendar year.

17. During the first six months of the calendar year 1922 the defendants produced from their mines and shipped approximately 300,000 tons of coal,

192      DISTRICT AND COUNTY REPORTS.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

representing the exhaustion of approximately fifty acres. The mines of the defendants have a combined capacity, under favorable labor conditions and car supply, of 6000 tons daily, and it is reasonable to expect, based on the growth and development of the past, that within a short period of time the defendants will mine the coal annually from underneath 150 to 200 acres of their lands, producing therefrom each year from 750,000 to 1,250,00 tons of coal.

18. All of the defendants in this case, other than John H. Prinkey, became the owners or lessees of the several tracts of coal which they now are engaged in mining after the erection of the Indian Creek reservoir, and after the investment in the construction of dams and pipe-lines for the purpose of utilizing the waters taken from Indian Creek.

19. Prior to the filing of the bill in this case a notice was served upon each of the defendants, and, in many instances, upon their predecessors in title in the ownership of the mines they now are engaged in operating, warning them not to discharge or permit to be discharged any water or drainage from their mines into Indian Creek or into any of its tributaries forming the Indian Creek watershed.

20. The reservoir of the Mountain Water Supply Company is in close proximity and in plain view of the railroad of the Indian Creek Valley Railroad Company, which furnishes the only railroad facilities in the Indian Creek Valley.

21. By Jan. 1, 1922, coal had been mined from approximately 300 acres of the land within the watershed of Indian Creek. The coal measure will produce from 4500 to 5000 tons per acre, and is sold in the eastern market in competition with the Clearfield and Somerset County coal for steam purposes. Immediately above the minable seam there is a bone coal from six to ten inches in thickness, which, together with additional rock and other materials taken from the roof of the mine in order to furnish head-room in the entries and haulage ways, commonly called gob, is taken from the mines and wasted on the bottom lands adjacent to Indian Creek or its tributaries near the mine openings, and during periods of rainfall considerable quantities of water, impregnated with sulphuric acid and other substances, wash from these piles of gob into Indian Creek and its tributaries to the injury of the water of the stream. Although there is some range in the flow of mine water depending on the conditions of the weather, the rate of flow of water from the mines in gallons per day per acre of exhausted territory is approximately 1760 gallons. As the mined-out territory increases, while the flow in gallons per acre will diminish somewhat, the acid contents of the flow will increase.

22. In the operations of bituminous coal mines there is a necessary accumulation and production of mine water, which contains sulphuric acid in its free state or in combination with other minerals.

23. In the development and operation of their mines, there is released and discharged by each of the defendants into the water of Indian Creek or its tributaries large quantities of water highly impregnated with sulphuric acid, commonly known as mine water, and as the exhausted territory of the mines of the defendants will increase, and as increased quantities of coal are mined therefrom, increased quantities of mine water will be released, which will become, as the mines grow older, more highly impregnated with sulphuric acid, all of which mine water will reach the fresh water of Indian Creek and its tributaries, and from thence will reach the reservoir of the Mountain Water Supply Company, all of the mining operations of the defendants being

3 D. & C.

on Indian Creek or its tributaries, distant from one mile to 11.6 miles above the dam.

24. The water which flows from the coal mines of the defendants enters the mines through crevices or breaks in the rock overlying the coal, and the chemical action resulting from its contact with the sulphur in the coal measure and with the oxygen in the air results in the impregnation of the water, so that when it flows from the mine openings it is highly charged with sulphuric acid, and such water is totally unfit for industrial and domestic use; the total acidity of the water flowing from the mines of the defendants approximating sixty grains per gallon.

25. Water in its natural condition in a stream is alkaline, which is a term denoting the opposite of acid. Mine waters flowing into a stream are diluted by the stream waters, and the stream for a time remains alkaline. But as the quantity of mine water increases, the alkalinity of the stream decreases until a point is reached when the waters of the stream are termed neutral. Thereafter, as the quantity of mine water increases, if in sufficient quantities, the natural alkalinity of the stream water is overcome by the acid in the mine water, and the stream becomes acid.

26. Mine water is not injurious to health, but if the proportion of acid is sufficiently high, it is unpalatable.

27. When the acidity of the mine water is so great as to overcome the natural alkalinity of the stream water, the latter water becomes unfit for steam purposes without treatment; and when the natural alkalinity of the stream water has been to a considerable degree overcome by the acidity of the mine water, the water of the stream becomes unfit for domestic use without being treated.

28. The water which flows from the mines of the defendants into Indian Creek, or into the tributaries of that stream, mingles with the fresh waters therein, and, as a consequence, by reason of the dilution and the natural alkalinity of the fresh waters of the stream at the flow-line of the reservoir, the waters had not become acid at any stage of the flow of the stream prior to the hearing in this case.

29. The natural alkalinity of the water of Indian Creek, however, has been substantially reduced in the neutralization of the acid in the mine flow. There have been continuous periods of so long as thirty days, since the waters of Indian Creek have been utilized by the plaintiffs, when the daily stream flow has been 6,000,000 gallons or less at the flow-line of the reservoir, but these periods of low flow were during the early periods in the development of defendants' mines, and prior to the rapid development and the consequent increase of mine flow of recent years.

30. By reason of the increased demands, the quantity of water taken from the reservoir of the Mountain Water Supply Company has increased largely in recent years, so that now the service of a booster station is required to increase the flow in the pipe-line.

31. The approximate quantity of water now taken daily from the reservoir of the Mountain Water Supply Company exceeds 10,000,000 gallons, and by reason of the rapid development of the mines of defendants, and the consequent rapid increase of mined-over territory from which mine drainage will flow, the supply of water in the reservoir of the Mountain Water Supply Company is in danger of becoming acid.

32. The presence of considerable quantities of acid in water used for steam making in locomotives or stationary boilers quickly destroys the boiler-tubes

and metal with which it comes in contact, which not alone reduces very considerably the normal life thereof and adds immensely to the cost of maintaining the same, but its presence lessens the efficiency of the boilers for steam making, causes serious interruption in the movement of trains, when used in locomotive boilers, and, due to the action on the boiler-tubes, increases the danger of explosion, and, consequently, the danger of damage to property and loss of human life.

33. One of the recognized methods of treatment of water containing sulphuric acid is by the introduction of lime therein, which precipitates the injurious ingredients, and the introduction then of soda-ash for the purpose of softening the water. Even when thus treated, the water is not satisfactory for use for steam purposes. There is resultant scale in the boiler-tubes, and a condition described by the witnesses as foaming, which is deceptive to those in charge of boiler-plants, requiring the pulling of the fires, the replacing of the boiler-tubes and the flushing of the boilers at frequent periods, with a consequent lessening of efficiency and service. But the degree of satisfaction to be obtained through the treatment of acid water for the purposes mentioned depends on the strength of the acidity and the method of treatment, there being other recognized methods of treatment than that mentioned.

34. Water contaminated by sulphuric acid corrodes metals in a greater or less degree, depending on the strength of the acid, but such water, if the acid content does not exceed twelve grains per gallon, may be neutralized and softened so as to be usable for domestic and industrial purposes.

35. There is no way to determine accurately the quantity or quality of the mine water which will be produced by a given mine, but in a fully-developed mine the quantity of the water is proportionate, to a certain extent, to the mined-out area.

36. Bituminous coal mines continue to accumulate and discharge sulphur-water long after the operation of the coal has ceased and the mines have been abandoned.

37. The mines in the Indian Creek Valley do not make more mine water than the average from the mines in the same seams of bituminous coal, nor of a greater acidity. Some bituminous mines produce proportionately more water and of a greater acidity.

38. The methods of conducting the mining operations and of handling and disposing of the mine water and gob at the mines in the Indian Creek Valley are the ordinary and usual methods.

39. There is no malice or negligence on the part of any of the defendants in the operation of their mines, or in the disposal of mine water or gob.

40. In the drift and slope mines in the bituminous districts, the customary way of handling mine water is to permit it to flow by gravity from the pit-mouth into the stream which is the natural drainage of the valley or watershed in which the mine is located.

41. Indian Creek is the natural and only practicable drainage for the coal in the Indian Creek Valley, and, with the exception of about 1500 acres, all of the coal in the veins now being operated may be drained by gravity into that stream or its tributaries.

42. All of the mines now in the Indian Creek Valley drain into Indian Creek or its tributaries.

43. Such pumping of water as is done in any of these mines does not change in any way the natural flow of the water from the mines, and is such as is usually and ordinarily practiced in many of the mines operated in the lower bituminous measures.

3 D. & C.

44. No mine operator in the bituminous coal fields treats the mine water so as to neutralize its acidity before it flows into the stream, in order to make the stream water usable for domestic and industrial purposes.

45. Only three methods have been suggested in the evidence for the treatment of the mine waters by defendants:

(a) Separate treatment by each operator of the water coming from his own mine at the mine.

(b) The construction of a conduit system by which to collect the waters of all the mines and conduct them down the stream to a point below the reservoir and there discharge them into the stream.

(c) To collect the waters from all the mines by a conduit system and conduct them to a central treatment plant, either above or below the reservoir.

46. It is not feasible or practicable for all or any of the coal operators in the Indian Creek Valley to treat the mine water at the mines or elsewhere in order to make the stream water usable for domestic or industrial purposes, and any such treatment of the mine water by the coal operators would entail an unreasonable expenditure upon them.

47. On account of practical, legal and economic difficulties, it is not feasible for all or any of the coal operators in the Indian Creek Valley to carry the mine water below the reservoir of the Mountain Water Supply Company, and such carrying of the mine water would entail upon them an unreasonable burden and expenditure.

48. The water of Indian Creek at the reservoir of the Mountain Water Supply Company, as affected by mine water, is not now unusable, either for domestic or industrial purposes, at the ordinary flow of the stream.

49. Even at the extreme low flow of 5,000,000 gallons per day, the neutralizing of the acidity of the waters of Indian Creek, as caused by mine water, now would be a simple and comparatively inexpensive process by the water companies.

50. The water of Indian Creek, assuming the continuation of mining at the present rate, even with the resultant increase in the quantity and acidity of the mine water, will not, for a period of at least ten years, need to be treated by neutralization and softening to a greater extent than is now done by many public water companies and municipalities.

51. Even after the period of ten years, by the building of storage dams on the upper parts of Indian Creek, or on some of its tributaries, the water at the reservoir of the Mountain Water Supply Company may be so diluted that for many years, by the usual and customary methods of treatment, it will be fit for domestic and industrial purposes.

52. The water of Indian Creek at the present time is so polluted by germs, resulting from human and animal excrement, that filtration is necessary in order to make the water suitable for domestic purposes.

53. Sulphur-water in itself is a germicide.

54. The mine water as it drains into Indian Creek is the water which the mines naturally discharge. Its impurity arises not from artificial, but natural causes.

55. The defendants have done nothing to change the character of the water or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on to the land artificially.

56. The safest, most reliable and most economic method of treatment of water which is affected by acidity, to render it usable for domestic and industrial purposes, is treatment by the water company which takes the water

196          DISTRICT AND COUNTY REPORTS.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

from the stream, particularly if the water of the stream must be filtered to remove pathogenic bacteria.

57. The Mountain Water Supply Company was incorporated March 13, 1902, under the Act of April 29, 1874, P. L. 73, and its supplements, for the following purpose, as set forth in its charter: "2nd. Said corporation is formed for the purpose of storing, transporting and furnishing of water, with the right to take rivulets and land, and erect reservoirs for holding water, for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom, and of acquiring all the rights, powers and privileges conferred upon corporations for said purposes, as described in the 18th paragraph of the 2nd section of the said Act of April 29, 1874, and the supplements thereto."

58. The original authorized capital stock of the Mountain Water Supply Company was $1000, which later was increased to $5,000,000, of which $1,467,900 was issued and outstanding at the time of the trial of this case, all of which stock is owned by the Pennsylvania Railroad Company, although a few qualifying shares may stand in the names of individuals.

59. By due corporate action on March 22, 1902, the Mountain Water Supply Company adopted resolutions purporting to appropriate for its corporate purposes perpetually all the waters of Indian Creek in Springfield Township, Fayette County, Pennsylvania, at, above and flowing into said stream at a point about five miles up the stream from the confluence of Indian Creek with the Youghiogheny River, but those resolutions did not accomplish a valid appropriation, as against defendants, because this company did not have the power of eminent domain, and because no compensation ever was made or secured to defendants or their predecessors in title.

60. On June 22, 1904, the Mountain Water Supply Company, by due corporate action, adopted resolutions purporting to appropriate for its corporate purposes 506 acres of land in Springfield Township, Fayette County, Pennsylvania, along and adjacent to Indian Creek, at about the point mentioned in the last above finding of fact, but those resolutions did not accomplish a valid appropriation, as against defendants, because this company did not have the power of eminent domain.

61. On April 7, 1905, the Mountain Water Supply Company, by due corporate action, adopted resolutions purporting to appropriate certain rights of way for the construction of pipe-lines from its source of supply on Indian Creek, through certain lands situate in Springfield and Bullskin Townships and the City of Connellsville, Fayette County, Pennsylvania, but those resolutions did not accomplish valid appropriations, as against defendants, because this company did not have the power of eminent domain.

62. In the year 1905, the American Pipe Manufacturing Company, for and at the expense of the Pennsylvania Railroad Company, on a force account contract, commenced the construction of a dam across the channel of Indian Creek, five miles above its confluence with the Youghiogheny River, known as the Mountain Water Supply Company or Indian Creek reservoir, which was completed about Nov. 16, 1906, for the storage of the waters of Indian Creek, of a capacity of 251,000,000 gallons; and during the same period a reservoir known as the Gibson Junction reservoir, with a capacity of 6,500,000 gallons, was constructed; together with a thirty-six inch pipe-line from the Indian Creek reservoir along Indian Creek to the Youghiogheny River, thence along the Youghiogheny River to South Connellsville, thence in a northerly direction to the right of way of the southwest branch of the Pennsylvania Railroad, about four and one-half miles south of Everson, and

3 D. & C.

thence along said right of way to Everson; a smaller pipe-line from Everson, along the southwest branch of the Pennsylvania Railroad, to South Greensburg, and thence along the main line of the Pennsylvania Railroad, through Pitcairn and crossing the Monongahela River, to a point on the right of way of the Monongahela Division; a pipe-line from South Connellsville, across the Youghiogheny River, to the right of way of the southwest branch of the Pennsylvania Railroad in Dunbar Township, thence along said right of way to Redstone Junction, thence along the Redstone branch of the Pennsylvania Railroad to Brownsville, and thence along the Monongahela Division of the Pennsylvania Railroad to 30th Street in the City of Pittsburgh; a branch pipe-line from Redstone Junction to Rainey Junction, near Uniontown; and at various points along the system, storage reservoirs, stand-pipes and other facilities for the proper distribution of the water; which entire impounding and distribution system was placed in operation in the early part of 1907.

63. The Pennsylvania Railroad Company was duly incorporated by an act of assembly entitled "An act to incorporate the Pennsylvania Railroad Company," approved April 13, 1846, for the purpose of constructing and operating lines of railroad as provided therein, and has constructed and has in use lines of railroad throughout southwestern Pennsylvania and elsewhere, supplying the principal centres of population and the manufacturing and mining industries with railroad facilities, and is engaged in both intrastate and interstate commerce.

64. From the time of the completion of the pipe-lines and reservoirs of the impounding and distribution system already mentioned, until the present time, the Pennsylvania Railroad Company has been supplied with water by means of said pipe-lines and reservoirs, which has been used by it in its locomotive and stationary boilers, and at its railroad yards and shops for its general corporate purposes.

65. The Dunbar Water Supply Company was incorporated Dec. 5, 1904, under the Act of April 29, 1874, P. L. 73, and the supplements thereto, with an authorized capital stock of $10,000, afterwards increased to $100,000, for the following purpose, as set forth in its charter: "2nd. Said corporation is formed for the purpose of the supply of water to the public in Dunbar Township, Fayette County, Pennsylvania, and to such persons, partnerships and associations residing therein as may desire the same."

66. On April 10, 1906, by due corporate action, the Dunbar Water Supply Company adopted a resolution purporting to appropriate the entire daily flow of Indian Creek and its tributaries, at the storage dam or reservoir of the Mountain Water Supply Company, but a valid appropriation was not accomplished thereby, as against defendants, because the resolution of appropriation was not followed by entry upon the ground, and because no compensation in pursuance of the resolution ever was made or secured to defendants or their predecessors in title.

67. On April 21, 1906, the Dunbar Water Supply Company, by due corporate action taken for that purpose, adopted a resolution purporting to appropriate certain rights of way for the location and construction of lines of pipe for the conveyance of water for use by the public within the district covered by its charter.

68. On Nov. 3, 1916, the Mountain Water Supply Company, by written agreement, consented to the taking by the Dunbar Water Supply Company, from the storage dam or reservoir on Indian Creek, a quantity of water not exceeding 2,000,000 gallons daily, during the continuance of the agreement, which still is in force and effect; the water thus secured by the Dunbar Water

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

Supply Company being alleged to be for the supply by it to its customers within the district covered by its charter; but no actual payments for water so taken ever have been made, the matters being covered by book entries merely, because of the relations between these two companies and their relation to the Pennsylvania Railroad Company; and none of the water thus secured by the Dunbar Water Supply Company is supplied by it to the public within the district covered by its charter, except that turned into the pipeline of the Pennsylvania Railroad Company on the latter company's right of way, which includes all the water so secured by the Dunbar Water Supply Company.

69. Neither the Mountain Water Supply Company nor the Dunbar Water Supply Company ever has conducted a genuine and *bona fide* general business, and neither of them ever has functioned separately from and independently of the other and the Pennsylvania Railroad Company.

70. During and prior to December, 1910, the Pennsylvania Railroad Company acquired all of the shares of the capital stock of the Mountain Water Supply Company at a cost of $1,501,400. The reproduction cost of the physical property of the Mountain Water Supply Company, as of April 12, 1921, was $3,282,000.

71. From the date of the incorporation of the Dunbar Water Supply Company, the Pennsylvania Railroad Company was the owner of all of the shares of its capital stock, although a few qualifying shares may stand in the names of individuals.

72. There is invested in the piping system of the Dunbar Water Supply Company $41,063, the reproduction cost of which, as of April 12, 1921, was $60,000.

73. The Pennsylvania Railroad Company has expended approximately $3,600,000 in the construction of that part of the water system the legal title to which is vested in it, the reproduction cost new of which, as of April 1, 1921, was $8,110,770.67.

74. The Indian Creek reservoir is located on land formerly owned by Joseph T. Bunting and others, acquired by the Mountain Water Supply Company by purchase. The drainage area of the valley tributary to Indian Creek and above the dam is approximately 110 square miles.

75. The Mountain Water Supply Company is the owner of all the riparian rights appurtenant to the lands adjoining Indian Creek, from the location of its dam and reservoir to the confluence of that stream with the Youghiogheny River, having acquired such rights either by purchase of the rights alone or by purchase of the land adjacent to the stream.

76. The defendants are not claiming anything by prescriptive rights.

77. The water-works system under consideration is a gravity system, and the high point in the system is the reservoir on Indian Creek.

78. The Westmoreland Water Company was incorporated Sept. 24, 1886, under the name of the Westmoreland Water Company of Ludwick Borough, for the purpose of supplying water to the public in the Borough of Ludwick, in Westmoreland County; and nearly twenty-six years later, on May 21, 1912, by due corporate action, the name of the corporation was changed to Westmoreland Water Company. Other water companies, each formed for the purpose of supplying water to the public in the municipal division of Westmoreland County, indicated by its name, were incorporated on the following dates: The Westmoreland Water Company of Unity Township, the Westmoreland Water Company of Hempfield Township, and the Westmoreland Water Company of Greensburg Borough, Sept. 24, 1886; the Penn Town-

3 D. & C.

ship Water Company, the Penn Borough Water Company, and the North Huntingdon Water Company, Aug. 10, 1887; and the Irwin Water Company, Feb. 14, 1889. Soon after the incorporation of these companies, they constructed their plants and works and commenced the supply of water to the public in the several municipal districts of Westmoreland County described in their respective charters. The original sources of their supply were mountain streams in Chestnut Ridge, Unity Township, Westmoreland County, with a combined drainage area of approximately 3.32 square miles.

79. On April 27, 1904, each of the several water companies last named, except the Irwin Water Company, whose like action was taken on May 19, 1904, by due corporate proceeding, adopted resolutions purporting to appropriate the waters of Indian Creek at a point in that creek upon lands of John W. McFadyen, which was a point in the stream below where the drainage from the mining operations of any of the defendants is discharged, the land of McFadyen being located at or near the confluence of Indian Creek and the Youghiogheny River, the alleged appropriation by the companies named being in the following proportion: Westmoreland Water Company of Ludwick Borough, one-twelfth; Westmoreland Water Company of Unity Township, one-twelfth; Westmoreland Water Company of Hempfield Township, three-twelfths; Westmoreland Water Company of Greensburg Borough, one-twelfth; Penn Township Water Company, three-twelfths; Penn Borough Water Company, one-twelfth; North Huntingdon Water Company, one-twelfth; Irwin Water Company, one-twelfth.

These resolutions did not accomplish valid appropriations, as against defendants, because they were not followed by entry upon the ground, and because no compensation ever was made or secured to defendants or their predecessors in title.

80. At Nos. 460 to 467, inclusive, in equity, in the Court of Common Pleas of Fayette County, Pennsyvlania, each of the companies last named filed a bill in equity against the Mountain Water Supply Company, in which the alleged superior right of each of said plaintiff companies to the waters of Indian Creek was asserted and sought to be established.

81. On April 27, 1910, the litigation involving the relative rights of said water companies to the waters of Indian Creek was compromised and settled by the execution and delivery of an agreement of that date.

82. On Dec. 26, 1913, pursuant to due corporate action theretofore taken, the Westmoreland Water Company of Unity Township, the Westmoreland Water Company of Hempfield Township, the Westmoreland Water Company of Greensburg Borough, the Penn Township Water Company, the Penn Borough Water Company, the North Huntingdon Water Company and the Irwin Water Company conveyed and assigned to the Westmoreland Water Company, formerly the Westmoreland Water Company of Ludwick Borough, all their corporate franchises and all of their property, real, personal and mixed, which proposed action had been approved by the Pennsylvania Water Supply Commission on Dec. 5, 1913.

83. In 1903, the Pennsylvania Railroad Company, upon the report of its engineers, the American Pipe Manufacturing Company, determined to use Indian Creek as a source of water supply for a large portion of its railroad in western and southwestern Pennsylvania, and employed the American Pipe Manufacturing Company to carry the plan into effect, under a force account or cost plus contract, and under the general supervision of certain of the executive officers of the railroad company.

84. In recommending Indian Creek as an available water supply for the

Pennsylvania Railroad Company, the American Pipe Manufacturing Company strongly recommended the acquisition of such coal in the valley as would prevent the contamination of the stream by mine water, and reported that such coal could be acquired at an approximate cost of $150,000, but the railroad company did not adopt the recommendation in regard to the acquisition of the coal.

85. The Pennsylvania Railroad Company, through the American Pipe Manufacturing Company, in 1903 or 1904, acquired all of the stock of the Mountain Water Supply Company then outstanding, the latter company at that time having no facilities for the impounding or distribution of water.

86. As the American Pipe Manufacturing Company proceeded to carry out the plan adopted by the Pennsylvania Railroad Company for the utilization of the waters of Indian Creek, and as work was done on that part of the system the legal title to which is vested in the Mountain Water Supply Company, the latter company issued additional shares of its capital stock to the American Pipe Manufacturing Company, which additional shares subsequently were turned over by the American Pipe Manufacturing Company to the Pennsylvania Railroad Company.

87. The entire impounding and distribution system for the utilization of the waters of Indian Creek was designed and constructed as one system by the American Pipe Manufacturing Company, at the instance and under the supervision of, and with funds furnished by, the Pennsylvania Railroad Company, for the purpose of utilizing the waters of Indian Creek in the operation of that portion of the railroad covered by the distributing system of the waterworks.

88. The water system facilities include sixteen storage reservoirs and standpipes, with a total capacity of 318,335,400 gallons; also 141.81 miles of pipelines, of a diameter of 36 inches or less, one line leading from the Indian Creek reservoir to Pittsburgh, by way of Connellsville, Scottdale and Greensburg, and another from the reservoir to Pittsburgh, by way of Uniontown, Brownsville and Monongahela City. All the water for this system is taken from Indian Creek.

89. The legal title to the Indian Creek reservoir, the booster station at the confluence of Indian Creek and the Youghiogheny River, the Gibson Junction reservoir at South Connellsville, and 13.63 miles of 36-inch pipe-line, from the Indian Creek reservoir to a point north of Connellsville, on the right of way of the Pennsylvania Railroad Company, is in the Mountain Water Supply Company. The legal title to .88 of a mile of 20-inch pipe-line, from a point on the 36-inch line at South Connellsville, thence crossing the Youghiogheny River to a point in Dunbar Township, on the right of way of the Pennsylvania Railroad Company, is in the Dunbar Water Supply Company. The legal title to the other reservoirs, stand-pipes and facilities, including the remainder of the pipe-lines, is in the Pennsylvania Railroad Company, the pipe-lines of that company being located generally on its right of way.

90. The acquisition by the Pennsylvania Railroad Company of all of the stock of the Mountain Water Supply Company, and its ownership of all the stock of the Dunbar Water Supply Company, and all of the actions of the latter companies in and subsequent to the year 1904, are parts of and incidental to the general plan prepared by the American Pipe Manufacturing Company and adopted by the Pennsylvania Railroad Company for the utilization of the waters of Indian Creek.

91. Since 1904, the officers and directors of the Mountain Water Supply Company and the Dunbar Water Supply Water have been officers or employees

3 D. & C.

of the Pennsylvania Railroad Company, except that during the earlier years some of the officers and directors of those water companies were officers or employees of the American Pipe Manufacturing Company. Since 1912, the executive officers and directors of both the Mountain Water Supply Company and the Dunbar Water Supply Company have been vice-presidents of the Pennsylvania Railroad Company.

92. The entire water system is maintained and operated as a unit and by one organization. The expenses of the maintenance and operation of the water system, including the compensation of the employees, are paid by the Pennsylvania Railroad Company. By entries made in books standing in the names of the Mountain Water Supply Company and the Dunbar Water Supply Company, but kept in the office of the treasurer of the Pennsylvania Railroad Company, in Philadelphia, the railroad company purports to be credited, and the respective water companies charged, with those portions of these expenses representing the maintenance and operation of those portions of the water system standing in the names of the respective water companies, and the evidence does not show that the railroad company is otherwise reimbursed.

93. The financial offices of the Mountain Water Supply Company and the Dunbar Water Supply Company are in the office of the treasurer of the Pennsylvania Railroad Company, in Philadelphia, their books and records being kept in that office under the supervision of said treasurer. Neither of the water companies has a bank account, all of their receipts being immediately turned over to and commingled with the funds of the Pennsylvania Railroad Company, charges therefor being made against the railroad company on the books of the water companies. No payments are made to the Mountain Water Supply Company by the Dunbar Water Supply Company or by the Pennsylvania Railroad Company, and no payments are made to the Dunbar Water Supply Company by the Pennsylvania Railroad Company, all transactions being taken care of by book entries. All disbursements made by or on behalf of either of the water companies are by what the witnesses term "voucher checks" drawn by the Mountain Water Supply Company or by the Dunbar Water Supply Company, payable at the Third National Bank of Philadelphia, in which bank neither of the water companies has, or ever has had, any funds, and which, on presentation by the Third National Bank of Philadelphia, are paid by checks of the Pennsylvania Railroad Company. At times, certain banks which cash such voucher checks do not even present them to the Third National Bank of Philadelphia, but directly to the Pennsylvania Railroad Company, whereupon they are paid to such banks by checks of the railroad company.

94. Under date of Jan. 1, 1907, the Pennsylvania Railroad Company, as party of the first part, the Mountain Water Supply Company and certain other companies, all of whose stock was owned by the Pennsylvania Railroad Company, as parties of the second part, and the Girard Trust Company, trustee, as party of the third part, entered into a trust agreement, a true and correct copy whereof is identified in the record as defendants' Exhibit No. 23.

95. The books of the Mountain Water Supply Company, from the beginning of its business until Dec. 31, 1915, show charges against the Dunbar Water Supply Company at 10 cents per 1000 gallons of water, but no payments by the Dunbar Water Supply Company, so that by Dec. 31, 1915, the accumulated charges amounted to about $395,000. The books of the Dunbar Water Supply Company for the same period show charges against the Pennsylvania Railroad Company at the same rate, with an accumulated charge in about the same amount, no payments having been made by the railroad company. In

202          DISTRICT AND COUNTY REPORTS.

Mountain Water Supply Co. et al. v. Sagamore Coal Co. et al.

October, 1916, entries were made in the books of both the Mountain Water Supply Company and the Dunbar Water Supply Company, the effect whereof was to charge off both of these accumulated sums.

96. The business and affairs of the Mountain Water Supply Company and of the Dunbar Water Supply Company have been and are so managed, and their funds and properties so commingled with the funds and properties of each other and of the Pennsylvania Railroad Company, that, for practical purposes, they have been and are nothing more than a department of the Pennsylvania Railroad Company.

97. The Mountain Water Supply Company has not filed any tariffs with the Public Service Commission of Pennsylvania, representing to the commission, in response to the demand that it file such tariffs, that it was serving but three customers, the Pennsylvania Railroad Company, the Dunbar Water Supply Company and the Westmoreland Water Company, with each of which it claimed to have a special contract.

98. There is a continuous 20-inch pipe-line extending from the 36-inch line of the Mountain Water Supply Company, near South Connellsville, across the Youghiogheny River, to the right of way of the southwest branch of the Pennsylvania Railroad Company in Dunbar Township, and thence along that right of way to Redstone Junction, beyond the limits of Dunbar Township, the legal title to the first .88 of a mile of which pipe-line, being that portion thereof between the 36-inch line of the Mountain Water Supply Company and said right of way of the railroad company, is in the Dunbar Water Supply Company, and constitutes the only tangible property of that company. The legal title to the remainder of said 20-inch pipe-line is in the Pennsylvania Railroad Company.

99. While there is evidence tending to show that the Mountain Water Supply Company sells water to the Dunbar Water Supply Company, under what purports to be a contract between them, and there is evidence tending to show that the Dunbar Water Supply Company sells water to the Pennsylvania Railroad Company, the manner in which the transactions between and among these companies have been handled evidences inter-department transactions within the Pennsylvania Railroad Company rather than ordinary business dealings between independent companies.

100. The Monongahela Railway Company has no facilities for the receipt of water in Dunbar Township, or within ten miles of the pipe-line of the Dunbar Water Supply Company in that township. The Monongahela Railway Company's pipe-line is connected with the pipe-line of the Pennsylvania Railroad Company, on the right of way of the southwest branch of the latter company near Redstone Junction, and the water is brought from the pipe-line of the Dunbar Water Supply Company, through the pipe-line of the Pennsylvania Railroad Company, and emptied into the pipe-line of the Monongahela Railway Company.

101. The Dunbar Water Supply Company never has filed with the Commissioner of Health certified copies of plans and surveys, specified in the Act of April 22, 1905, P. L. 260.

102. The Dunbar Water Supply Company never has filed any tariffs with the Public Service Commission of Pennsylvania.

103. The Dunbar Water Supply Company does not serve, and never has served, water to the public generally in Dunbar Township.

104. The contract of April 27, 1910, between the Mountain Water Supply Company and certain other companies, which since have been merged so as

3 D. & C.

to form the Westmoreland Water Company, was entered into as the result and in settlement of certain litigation pending in the Court of Common Pleas of Fayette County, Pennsylvania, in which the constituent companies of the Westmoreland Water Company alleged that they had rights to the waters of Indian Creek superior to the rights, if any, of the Mountain Water Supply Company, and that the Mountain Water Supply Company was serving no public use, and in which litigation the *bona fide* character of the claims of said constituent companies was seriously attacked by the Mountain Water Supply Company.

105. The supply of water to the Westmoreland Water Company, or any of its constituent companies, never was intended as a purpose of the water system. The contract for such supply resulted from litigation in which the rights claimed by the Mountain Water Supply Company were seriously contested.

106. The entire system which utilizes the waters of Indian Creek was designed and constructed and is used for the furnishing of water in the operation of the Pennsylvania Railroad, so that, for all practical purposes, it is a facility of that railroad company.

107. If any of the plaintiffs have the power to condemn the whole or any part of the waters of Indian Creek, and if any proceeding for the appropriation of the waters of that stream, taken by any of the plaintiffs, had the effect of taking, injuring or destroying any property or property rights of the defendants or their predecessors in title, no compensation ever has been paid or secured to the defendants or their predecessors in title or any of them.

108. None of the defendants, or their predecessors in title, ever has consented to or acquiesced in the construction by the plaintiffs, or any of them, of any facilities for the impounding, transportation or use of the waters of Indian Creek.

109. Many of the municipal water supplies in western Pennsylvania are taken from streams contaminated by sewage and mining and industrial wastes, the water being made potable and suitable for domestic purposes by methods of treatment which are commonly recognized and generally used.

110. Water contaminated with mining and industrial waste is extensively used in western Pennsylvania for steam and other industrial purposes, after being treated by the municipal or public corporation supplying the water, and, in some cases, further treated by the users.

111. Large portions of the Pittsburgh & Lake Erie Railroad and the Baltimore & Ohio Railroad in western Pennsylvania are supplied with water taken from the Monongahela River or the Youghiogheny River, both of which rivers are acid at certain seasons of the year. Although such water may not be entirely satisfactory for steam purposes, it does not appear that these railroad companies use the most modern and adequate methods of treatment.

112. It is the uniform practice, everywhere prevailing, for those engaged in supplying water under corporate privileges to filter or otherwise treat the water in an attempt to make it suitable for its intended uses.

113. The neutralization and softening, or other treatment, of the waters of Indian Creek, by the plaintiffs, at the Indian Creek reservoir, or at some other convenient point, if, when and as necessary, will not entail an unreasonable burden upon the plaintiffs.

### The Sanderson Case.

In the case of the Pennsylvania Coal Co. *v.* Sanderson, 113 Pa. 126, it was held that one operating a coal mine in the ordinary and usual manner may,

upon his own lands, drain or pump the water which percolates into his mine into a stream which forms the natural drainage of the basin in which the mine is situate, although the quantity of the water may thereby be increased and its quality so affected as to render it totally unfit for domestic purposes by the lower riparian owners, and that damages resulting to another from the natural and lawful use of his land by the owner thereof in such a way are, in the absence of malice or negligence, *damnum absque injuria.*

The Pennsylvania Coal Company was the owner of 1600 acres of anthracite coal in the Lackawanna Valley, situate above the City of Scranton, in the basin of a small tributary of the Lackawanna River, known as Meadow Brook, into which, owing to the natural conformation of the surface, the water from those lands flowed. The company opened the coal seams on the land by a drift or tunnel, and later drove three other tunnels and sunk a shaft, and thereafter engaged extensively in mining operations, the plant being known as the Gipsy Grove Coal Works. From the time the first tunnel was driven, the mine water flowed by the natural course of gravity into Meadow Brook, and as the operation of the mines was increased, the volume of mine water increased. The water which percolated into the shaft was pumped therefrom by engines, and as it was brought to the surface, it passed with the flow from the tunnel by an artificial watercourse over the coal company's own land into Meadow Brook.

At about the time the mines were being opened, Mrs. Sanderson purchased a tract of land in the City of Scranton, about three miles below the Gipsy Grove Coal Works, on Meadow Brook, near its mouth, and erected on the land a handsome residence, in connection wherewith dams were built across the brook to form a fish and ice pond, and to supply a cistern, from which the water was forced by a hydraulic ram to a tank in the house, where it was used for domestic purposes and in a fountain. It was claimed that the existence of the stream, the purity of its water and its utility for domestic purposes was a leading inducement to Mrs. Sanderson's purchase.

It was alleged that the large volume of mine water which the coal company drained into Meadow Brook corrupted the water of the stream to such an extent as to render it totally unfit for domestic use; that the fish were destroyed; that the water-pipes about the premises corroded; and that the entire apparatus for the utilization of the water for domestic purposes was rendered worthless, and, in consequence thereof, was abandoned. The matter got into court by an action brought by Mrs. Sanderson to recover damages which she alleged she had sustained resulting from the pollution of the stream. At the trial of the case in the Common Pleas, the court entered a compulsory non-suit, on the grounds that the discharge of the mine water was a necessary incident to mining; that there was neither malice nor negligence shown in the operation of the mines; and that the case, therefore, was one of *damnum absque injuria.*

The case went to the Supreme Court four times; first, on writ of error to take off the non-suit, which was stricken off, and the case was sent back for decision by a jury; second, on writ of error after a jury had returned a verdict for the plaintiff, when the judgment on the verdict was affirmed; third, on a second writ of error to the same judgment, on a question as to the proper measure of damages, on which writ the judgment was reversed, after which the case was retried; and fourth, on a writ of error after the retrial of the case, and judgment again on a verdict for the plaintiff, when practically a reargument of the whole case was had, resulting in a reversal by the Supreme Court of its earlier decision. See 86 Pa. 401; 94 Pa. 302; 102 Pa. 370; 113

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

Pa. 126. The broad ground on which Mrs. Sanderson's right of action originally was sustained by the Supreme Court, as reported in 86 Pa. 401, was that, "However laudable industry may be, its managers are still subject to the rule that their property cannot be so used as to inflict injury on the property of others."

In specifically reversing its own previous decision in that respect, and establishing that which now for nearly forty years has been recognized and followed as one of the fundamental laws of coal mining in Pennsylvania, during which period the mining industry has reached its greatest importance, the Supreme Court, through Mr. Justice Clark, as reported in 113 Pa. 126, said: "It will be observed that the defendants have done nothing to change the character of the water, or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on to the land artificially. The water as it is poured into Meadow Brook is the water which the mine naturally discharges; its impurity arises from natural, not artificial, causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it. It must be conceded, we think, that every man is entitled to the ordinary and natural use and enjoyment of his property; he may cut down the forest trees, clear and cultivate his land, although in so doing he may dry up the sources of his neighbor's springs, or remove the natural barriers against wind and storm. If, in the excavation of his land, he should uncover a spring of water, salt or fresh, acidulated or sweet, he will certainly not be obliged to cover it again, or to conduct it out of its course, lest the stream, in its natural flow, may reach his neighbor's land. It has always been considered that land on a lower level owes a natural servitude to that on a higher level, in respect of receiving without claim for compensation by the owner the water naturally flowing down to it. . . . The defendants, being the owners of the land, had a right to mine the coal. It may be stated, as a general proposition, that every man has the right to the natural use and enjoyment of his own property, and if, whilst lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria,* for the rightful use of one's own land may cause damage to another without any legal wrong. Mining in the ordinary and usual form is the natural user of coal lands; they are, for the most part, unfit for any other use. . . . The right to mine coal is not a nuisance in itself. It is, as we have said, a right incident to the ownership of coal property, and when exercised in the ordinary manner and with due care, the owner cannot be held for permitting the natural flow of mine water over his own land into the watercourse, by means of which the natural drainage of the country is effected. There are, it is well known, percolations of mine water into all mines. Whether the mine be operated by tunnel, slope or shaft, water will accumulate, and, unless it can be discharged, mining must cease. The discharge of this acidulated water is practically a condition upon which the ordinary use and enjoyment of coal lands depends; the discharge of the water is, therefore, part and parcel of the process of mining, and as it can only be effected through natural channels, the denial of this right must inevitably produce results of a most serious character to this, the leading industrial interest of the State. The defendants were engaged in a perfectly lawful business, in which they had made large expenditures, and in which the interests of the entire community were concerned; they were at liberty to carry on that business in the ordinary way, and were not, while so doing, accountable for consequences which they could not control. As the

206     DISTRICT AND COUNTY REPORTS.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

mining operations went on, the water by the mere force of gravity ran out of the drifts and found its way over the defendant's own land to Meadow Brook. It is clear that for the consequences of this flow, which by the mere force of gravity, naturally, and without any fault of the defendants, carried the water into the brook and thence to the plaintiff's pond, there could be no responsibility as damages on the part of the defendants. . . . It does not appear from any evidence in this cause that the mine was conducted by the defendant in any but the ordinary and usual mode of mining in this country. The deeper strata can only be reached by shaft, and no shaft can be worked until the water is withdrawn. A drift is in some sense an artificial opening in the land and accumulates and discharges water in a greater volume and extent than would otherwise result from purely natural causes; yet mining by drift has, as we have seen, been held to be a natural user of the land. So, too, we think, according to the present practice of mining, the working of the lower strata by shaft in the usual and ordinary way must be considered the natural user of the land for the taking out of the coal, which can be reached by shaft only; and, as the water cannot be discharged by gravity alone, it must necessarily, as part of the process of mining, be lifted to the surface by artificial means, and thence be discharged through the ordinary natural channels for the drainage of the country. . . . It is said the defendants created an artificial watercourse from their mine to Meadow Brook, but this artificial watercourse was upon their own land, and conducted no more water to the brook than by the natural conformation of the surface could otherwise have reached it. If it be suggested that the defendants might have extended this artificial waterway, in form of a sewer, to some point of safety, it may be asked, where, short of the sea, might the sewer be discharged that the same complaint might not be made? . . . The defendants, in the case at bar, brought nothing upon the land; they accumulated nothing there; the water was there without any act of theirs, and it was the accumulation of it which they sought to prevent. They were in the natural user of their lands for a lawful purpose, and the discharge of the mine water was an absolute necessity in order to that use of the land. . . . There is a well known line of cases in Pennsylvania and elsewhere which decide that a stream of water may not be fouled, by the introduction into it of any foreign substance, to the damage and injury of the lower riparian owners. We do not understand the principle of these cases to be denied. And we think they are not pertinent to the question now under consideration. The defendants introduced nothing into the water to corrupt it; the water flowed into Meadow Brook just as it was found in the mines; its impurities were from natural and not from artificial causes. It may be said that if the mines had not been opened, the water which flowed into the stream would have been pure; but as Chief Justice Lewis said in Wheatley *v.* Baugh, 25 Pa. 528, 'the law has never gone so far as to recognize in one man the right to convert another's farm to his own use for the purpose of a filter.' . . . As the discharge of mine water is incident to all mining, it is probable that there is scarcely a stream in the mining regions of Lackawanna County which is not to a greater or less extent similarly affected; but, adopting the language of our brother Paxson, in his dissenting opinion, on the first writ of error (see 113 Pa. 156) : 'The population, wealth and improvements are the result of mining, and of that alone. The plaintiffs knew, when they purchased their property, that they were in a mining region; they were in a city born of mining operations, and which had become rich and populous as the result thereof. They knew that all mountain streams in that section were affected by mine water, or were liable to be. Having enjoyed the

3 D. & C.

advantages which coal mining confers, I see no great hardship, nor any violence to equity, in their also accepting the inconvenience necessarily resulting from the business.' "

It is true that in another paragraph of the opinion from which the above is taken, Mr. Justice Clark said: "We do not say that a case may not arise in which a stream from such pollution may not become a nuisance, and that the public interests, as involved in the general health and well-being of the community, may not require the abatement of that nuisance. This is not such a case; it is shown that the community in and around the City of Scranton, including the complainant, is supplied with abundant pure water from other sources; there is no complaint as to any injurious effects from this water to the general health; the community does not complain on any grounds. The plaintiff's grievance is for a mere personal inconvenience, and we are of opinion that mere private personal inconvenience, arising in this way and under such circumstances, must yield to the necessities of a great public industry, which, although in the hands of a private corporation, subserves a great public interest. To encourage the development of the great natural resources of a country, trifling inconveniences to particular persons must sometimes give way to the necessities of a great community." It will be noticed that particular reference is made there to "the public interests, as involved in the general health and well-being of the community," that "there is no complaint as to any injurious effects from this water to the general health," and that "the community does not complain on any grounds." In another part of this opinion we shall give consideration to the interests of the public in the present litigation, as represented by the Commonwealth of Pennsylvania, through its Attorney-General, an intervening party plaintiff on the record. In still another paragraph of Mr. Justice Clark's opinion, immediately following the paragraph last above quoted, this is said: "Nor do we say that a miner, in order that his mines may be made available, may enter upon his neighbor's lands, or inflict upon him any other immediate or direct injury, but we do say that in the operation of mining, in the ordinary and usual manner, he may, upon his own lands, lead the water which percolates into his mine into the streams which form the natural drainage of the basin in which the coal is situate, although the quantity as well as the quality of the water in the stream may thereby be affected."

The Sanderson case is referred to a score and a-half times in subsequent decisions of the Supreme Court, and many times in subsequent decisions of the Superior Court. We have examined all of them. But in no case has the Supreme Court changed or altered the decision in the · Sanderson case, although some of the later cases explain more in detail what is meant by the words "an unavoidable loss," as used by Mr. Justice Cleark in his opinion in the Sanderson case. It is true it was said by Mr. Justice Brown, in Sullivan *v.* Jones & Laughlin Steel Co., 208 Pa. 540, that the doctrine of the Sanderson case "has never been, and never ought to be, extended beyond the limitations put upon it by its own facts," but that in no way alters the decision. In Robertson *v.* Youghiogheny River Coal Co., 172 Pa. 566, the court refused to apply the principle of the Sanderson case because it was not applicable to the question there before the court, Mr. Justice Williams saying: "This court, however, is not disposed at present to modify the rule of Sanderson's case as it is stated above. That rule has no application to this case."

In Collins *v.* Chartiers Valley Gas Co., 131 Pa. 143, it was said by Mr. Justice Mitchell: "With regard to the use and control of flowing water, and of watercourses, the case of Pennsylvania Coal Co. *v.* Sanderson, 113 Pa. 126,

definitely settled the rule that for unavoidable damage to another's land, in the lawful use of one's own, no action can be maintained. No other result seems possible, without restricting the uses, derogating from the full enjoyment and diminishing the value of property. But the rule does not go beyond proper use and unavoidable damage. It is thus clearly expressed in the opinion from brother Clark: 'Every man has the right to the natural use and enjoyment of his own property, and if, while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria.*' . . . The principle of Pennsylvania Coal Co. v. Sanderson is precisely the same as that of Wheatley v. Baugh, 25 Pa. 528, and is of general application. It is, that the use which inflicts the damage must be natural, proper and free from negligence, and the damage unavoidable. On the question of negligence, the question of knowledge is always important, and may be conclusive. Hence, the practical inquiry is, first, whether the damage was necessary and unavoidable; secondly, if not, was it sufficiently obvious to have been foreseen, and also preventable by reasonable care and expenditure? If the plaintiff showed that the injury was plainly to be anticipated, and easily preventable with reasonable care and expense, he brought himself within the exception of all the cases from Wheatley v. Baugh to Pennsylvania Coal Co. v. Sanderson, inclusive." And this was repeated in substance in Pfeiffer v. Brown, 165 Pa. 267, where Mr. Justice Mitchell made the following statement as to what is meant by reasonable care and expenditure: "If the expense of preventing the damage from his act is such as practically to counterbalance the expected profit or benefit, then it is clearly unreasonable, and beyond what he could justly be called upon to assume. If, on the other hand, however large in actual amount, it is small in proportion to the gain to himself, it is reasonable in regard to his neighbor's rights, and he should pay it to prevent the damage, or should make compensation for the injury done. Between these two extremes lies a debatable region where the cases must stand upon their own facts, under the only general rule that can be laid down in advance, that the expense required would so detract from the purpose and benefit of the contemplated act as to be a substantial deprivation of the right to the use of one's own property. If damage could have been prevented short of this, it is *injuria* which will sustain an action." It was held in McCune v. Pittsburgh & Baltimore Coal Co., 238 Pa. 83, as stated in the syllabus, that "A person operating a coal mine on his own land is liable in damages where it appears that the mine water is diverted from its natural outlet and by artificial means raised to the surface and discharged into a stream of pure water which, by reason of its higher elevation, did not form the natural drainage of the mine," but the real basis of that decision was that the burden was on the defendant to show that the injury was not to be avoided by reasonable care and expenditure, and that it having failed to establish that the injury was unavoidable or that to prevent it would have necessitated such expense as would have deprived it of the use of its property, the injunction prayed for should be awarded.

It was said by Mr. Justice Kephart, when on the Superior Court bench, in Clouse v. Crow, 68 Pa. Superior Ct. 248: "Assuming, as the court did in the Sanderson case, that water is a necessary incident to a mining operation, to such an extent that those who engage in the business must know that they will encounter water and resultant damage must be foreseen, when an injury is caused by the flowage of mine water, the burden is on the defendant to show that it was unavoidable and could not be prevented except by an unreasonable expenditure. If the defendant meets that burden, the plaintiff to

3 D. & C.

recover must show that there was negligence or malice. If this is shown by the plaintiff in the first instance, of course he is entitled to recover. If the defendant fails to show that the damage is unavoidable and could not have been prevented except at an unreasonable expense, then, under the authority of McCune *v.* Pittsburgh & Baltimore Coal Co., 238 Pa. 83, the plaintiff need not show negligence or malice." The case then under consideration was one for the recovery of damages. It appeared that the plaintiff was the owner of a farm of twenty-four acres. Immediately adjoining his farm, and located on a higher level, the defendant, on his own property, opened a coal operation twenty-five feet from the plaintiff's land. This was done by a drift driven with the dip of the coal. The water percolating through the coal accumulated in the interior of the mine. The drift or pit-opening was higher than this water level and prevented its flow by gravity out of the pit-mouth. A vein of fire-clay lay immediately below the coal and formed a water-tight basin, which prevented the water in its natural flow from further percolation to the surface. To allow drainage, the defendant dug a small ditch alongside of his mine track. This permitted the water to flow by gravity from the interior of the mine to the surface on his ground, thence to the plaintiff's ground, and, being acidulous, it destroyed the vegetation on about half an acre of plaintiff's land. There was no actual evidence that the injury could have been avoided by due care or expenditure, but the plaintiff raised no question as to the sufficiency of the evidence, and tried the case on the theory that such evidence was present. There was no proof of malice or negligence. And it was held that a judgment on a verdict for the defendant should be sustained.

Judge Porter, of the Superior Court, has stated the rule thus: "When, in the development of the natural resources of the land, the water from a mine must necessarily and unavoidably pass into a stream, and that consequence could only be avoided by an expenditure which would amount to a practical prohibition of the development of the land, the injury to a lower riparian owner resulting from such unavoidable mixture of the water of the mine with that of the stream is a private injury for which there is no remedy:" Com. *v.* Emmers, 33 Pa. Superior Ct. 151; s. c., 221 Pa. 298. Mr. Chief Justice Mitchell, in Strauss *v.* Allentown, 215 Pa. 96, said: "Every man has the right to the natural, proper and profitable use of his own land, and if, in the course of such use without negligence, unavoidable loss is brought upon his neighbor, it is *damnum absque injuria*. This is the universal rule of the common law, and nowhere is it more strictly enforced than in Pennsylvania. After elaborate and repeated argument and the most mature consideration, it was applied to a case admittedly of great hardship, difficulty and doubt, involving a serious choice of evils, in Pennsylvania Coal Co. *v.* Sanderson, 113 Pa. 126. No ordinary case could be sufficient to raise a further doubt on the rule of its application where the use is proper and the damage unavoidable: Collins *v.* Chartiers Valley Gas Co., 131 Pa. 143."

### The Mountain Water Supply Company.

The Mountain Water Supply Company was incorporated March 13, 1902, under the Act of April 29, 1874, P. L. 73, and its supplements, for the following purpose, as set forth in its charter: "Said corporation is formed for the purpose of storing, transporting and furnishing of water, with the right to take rivulets and land, and erect reservoirs for holding water, for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom, and of acquiring all the rights, powers and privileges conferred upon corporations for said purposes,

as described in the 18th paragraph of the 2nd section of the said Act of April 29, 1874, and the supplements thereto." The capital stock of the company was fixed in its charter at $1000, divided into twenty shares of a par value of $50 each, and all the stock was subscribed for by the incorporators, although but $100, being 10 per centum of the capital stock, was paid in at that time.

The 18th paragraph of section 2 of the Act of 1874 provided for the incorporation of companies for various purposes, "including the storage and transportation of water, with the right to take rivulets and land, and erect reservoirs for holding water." By the supplemental Act of May 21, 1889, P. L. 259, that clause was amended and extended so as to read, "including companies for the storage, transportation and furnishing of water, with the right to take rivulets and land, and erect reservoirs for holding water, for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom," which remains unchanged by any subsequent legislation, and is the authority for the incorporation of the company now under consideration.

By the 9th paragraph of section 2 of the Act of 1874, companies were authorized for "the supply of water to the public," which, by the supplemental Act of May 16, 1889, P. L. 226, was amended so as to read, "the supply of water to the public, or the supply, storage or transportation of water and water power for commercial and manufacturing purposes."

The 3rd section of the Act of 1874 requires the charter of a corporation to set forth the place where its business is to be transacted, and the Act of May 16, 1889, P. L. 226, in amending clause 2 of section 34 of the Act of 1874, provides that: "Where such companies shall be incorporated for the supply of water to the public, or for storing and transportation or supply of water and water power for commercial and manufacturing purposes, they shall have power to provide, erect and maintain all works and machinery necessary or proper for raising and introducing into the town, borough, city or district where they may be located a sufficient supply of pure water, or water and water power, and for that purpose may provide, erect and maintain all proper buildings, cisterns, reservoirs, pipes and conduits for the reception and conveyance of water or water power, and shall have power to appropriate so much of the water from the rivers, creeks, canal water rights and easements, within or without the limits of the city, borough or place in which said company may by its charter be located, as may be necessary for its purposes, and all damage done thereby shall be ascertained, recovered and paid as provided for in the 41st section of the act to which this is a supplement." The latter act provides that water companies incorporated under its provisions shall have power to supply water in "the town, borough, city or district where they may be located." This language clearly and expressly limits the authority of a water company under that act to the municipal or quasi-municipal division in which it is located. It can exercise its corporate functions in only a single territorial division, and that division is where it "may be located:" Bly v. White Deer Mountain Water Co., 197 Pa. 80.

It is provided by section 41 of the Act of 1874 that in all cases where the parties cannot agree upon the amount of damages to be paid for property taken by a corporation under its power of eminent domain, the corporation shall tender a bond, with at least two sufficient sureties, to the party claiming or entitled to any damages, the condition of which shall be that said corporation will pay, or cause to be paid, such amount of damages as the party shall be entitled to receive after the same shall have been agreed upon by the par-

3 D. & C.

DISTRICT AND COUNTY REPORTS. 211

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

ties, or assessed in the manner prescribed by the act, provided that in case the party or parties claiming damages refuse and do not accept the bond as tendered, the corporation shall then give the party a written notice of the time when the same will be presented for filing in court, and thereafter the corporation shall present the bond to the Court of Common Pleas of the county where the property is situate, and, if approved, the bond shall be filed in said court for the benefit of those interested, and recovery may be had thereon for the amount assessed, if the same be not paid or cannot be made by execution on the judgment in the issue formed to try the question.

In Portland Water and Power Co. *v.* Portland Water Co., 29 Pa. C. C. Reps. 180; s. c., 13 Dist. R. 659, it was ruled by the Attorney-General (Carson) that under the legislation above noted, three classes of water companies are created:

"1. For the supply of water to the public.

"2. For the supply, storage and transportation of water and water power for manufacturing and commercial purposes.

"3. For the storage, transportation and furnishing of water for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom."

It was said there that applications for charters for either the first or second class must be made under paragraph 9 of section 2 of the Act of 1874, as amended by the Act of May 16, 1889, P. L. 226, and that an application for a charter of the third class must be made under paragraph 18 of section 2 of the Act of 1874, as amended by the Act of May 21, 1889, P. L. 259. And it was said further that companies of the first class are purely local, and that the application for the charter must disclose the district or locality in which the company is to operate, as also must an application for a charter of the second class, which also is local, because being authorized by an amendment of paragraph 9 of section 2 of the Act of 1874, they are swept by force of the amending act within the 9th paragraph, and are, therefore, embraced by the provisions of the law which emphasized the local character of companies chartered under that paragraph. It was said that the second class occupy a border-ground between companies authorized by the 9th paragraph of the 2nd section of the Act of 1874, as unamended, and the 18th paragraph of the 2nd section of the same act, as unamended, and that the result of the amendment of May 16, 1889, P. L. 226, was to cause a partial introduction into paragraph 9 of section 2 of the Act of 1874 of what theretofore had constituted a substantial part of paragraph 18 of section 2 of that act. And it was said that companies of the third class are not merely local, that the application for charter need not be confined to a single district where the water and water power are to be furnished, being under paragraph 18 of section 2 of the Act of 1874, which is saved from destruction and absorption by the later Act of May 21, 1889, P. L. 259, which amends it in such a manner as to establish a material and substantial distinction between the third class and classes one and two, which distinction must be observed in order to give effect to paragraph 18 of section 2 of the Act of 1874, as amended by the Act of May 21, 1889.

By reason of all of this, it is contended by counsel for defendants that a corporation formed under paragraph 9 of section 2 of the Act of 1874, as amended, is public and has the right of eminent domain, its public character being due to the fact that it is formed to serve the public in one community or district which must be specified in its charter, while a corporation formed under paragraph 18 of section 2 of the Act of 1874, as amended, is private, and does not have the power of eminent domain, because it is not required to

specify in its charter any particular district which it may and is required to serve, and because the Constitution forbids the taking of property for private purposes.

In Peifly v. Mountain Water Supply Co., 214 Pa. 340, the corporation now under consideration, the plaintiff in the lower court was refused a preliminary injunction restraining the defendant from appropriating a right of way for a pipe-line across the plaintiff's land in Connellsville Township, Fayette County, it being alleged that the defendant was without any authority to make such appropriation, the decree of the lower court was reversed, and it was directed that an injunction be awarded as prayed for, the Supreme Court, in a per curiam opinion, saying: "The Mountain Water Supply Company being chartered under clause 18 of the second class in section 2 of the Act of April 29, 1874, P. L. 73, is presumably a corporation for private uses which cannot constitutionally be invested with the right of eminent domain. The appellant, therefore, is entitled to protection from interference with his property by the maintenance of the status quo until the facts and the rights of the parties are shown upon full hearing." The record in this court shows that later the matters were adjusted by the parties and that the case was discontinued.

In Jacobs v. Clearview Water Supply Co., 220 Pa. 388, it was said by Mr. Justice Elkin: "Water companies created under clause 9 for the supply of water to the public for domestic purposes are invested with the right of eminent domain. This is not denied in the present proceedings, and could not be, for it is so provided in the statutes and has been so decided by the courts. We start with this proposition as settled law. It is equally well settled that a company incorporated under clause 18 of the Act of 1874 for the storage, transportation and furnishing of water, with the rights, privileges and powers thereby conferred, is presumably a corporation for private purposes, not intended to supply water for public use, and is not invested with the right of eminent domain: Peifly v. Mountain Water Supply Co., 214 Pa. 340. Here, then, is a clear line of distinction between water companies incorporated under clauses 9 and 18 of the original Act of 1874, one for a public use with the right of eminent domain, and the other for a private purpose, not enjoying such right. The legislature made the distinction and the courts have recognized and followed it. The respondent company was incorporated under clause 9, but not for the supply of water to the public as authorized in the original act, but for 'the supplying, storage or transportation of water and water power for commercial and manufacturing purposes,' as provided in the supplemental Act of May 16, 1889, P. L. 226. For some reason, no doubt satisfactory to the legislative mind, the original classification of water companies under the Act of 1874 was not deemed adequate to cover public necessities, and, as a result, the Act of 1889 was passed, which broadened the scope and character of companies to be organized under clause 9. It is perfectly clear that the legislature, in the Act of 1889, intended to confer upon companies incorporated for the supply, storage or transportation of water and water power for commercial and manufacturing purposes the same rights, privileges and powers as those possessed by companies chartered for the supply of water to the public under clause 9 of the Act of 1874. The legislative intention to make a distinction between a corporation created under clause 9 for a public use and one created under clause 18 for private purposes clearly appears, not only in the statutes relating to such corporations, but in the decisions of the courts. This position is not seriously controverted in the present case, but it is contended that, even if the legislature did invest a company incorporated for the supply, storage and transportation of water and

3 D. & C.

water power for commercial and manufacturing purposes with the right of eminent domain, such legislative authority is not conclusive of the rights of the parties here, because whether the purpose for which the respondent company was incorporated is a public use is a question to be finally determined by the courts. We so understand the rule, and must, therefore, determine whether the use for which the respondent company was chartered is a public one within the meaning of the law."

While, as said in substance in the above quotation from Jacobs *v.* Clearview Water Co., 220 Pa. 388, even if the legislature does invest a corporation with the right of eminent domain, such legislative authority is not conclusive, because whether the purpose for which the company was incorporated is a public use is a question to be finally determined by the courts, the converse of that proposition—that when the legislature has withheld from a corporation the power of eminent domain, the court, nevertheless, may determine the purpose for which the company was incorporated to be a public use, and so invest the corporation with the power of eminent domain—is not true. It was said specifically in the case last cited: "The legislative intention to make a distinction between a corporation created under clause 9 for a public use and one created under clause 18 for private purposes clearly appears, not only in the statutes relating to such corporations, but in the decisions of the courts."

The rights and powers of a corporation are to be determined, not from what it does, or pretends to do, or attempts to do, but from what appears on the face of its charter and the language of the legislation authorizing its formation. The test is not what the corporation has done, or what it may attempt to do, but what it is authorized to do, and may be compelled to do, under its charter in the performance of the duties imposed thereby. The powers, privileges and duties of a corporation are fixed by its charter, and in a legal proceeding must be determined by the requirements of the charter: Conoy Township Supervisors *v.* York Haven Electric Power Plant Co., 222 Pa. 319. A corporation has no natural rights, and there can be no authority or power conferred upon it by the certificate of incorporation or letters-patent, except such as are clearly given by, or necessarily implied from, the language of the statute under which it is granted. The rights and privileges of a corporation must be written in the charter, or they do not exist. When a corporate body asserts its right to do a thing or to deprive an individual of his property, even for an adequate compensation, it must be able to show that the right is conferred by the plain and unequivocal language of its charter. If a particular power be omitted from the charter of a corporation, it is to be taken as a prohibition against its exercise, unless there is an imperative implication of its inclusion. That which a company is authorized to do by its act of incorporation, it may do; beyond that, all of its acts are illegal. And the power must be given in plain words or by necessary implication. All powers not given in this direct and unmistakable manner are withheld. In such cases, ingenuity has nothing to work with, since nothing can be either proved or disproved by logic or inferential reasoning. If it be asserted that a corporation has certain privileges, the words of the legislature conferring them must be shown. Failing in this, the claim must be given up, for nothing else can possibly avail. The language of the charter is to be construed most strongly against the corporation. A doubtful charter does not exist, because whatever is doubtful is decisively certain against the corporation: Bly *v.* White Deer Mountain Water Co., 197 Pa. 80; Com. *v.* Erie & Northeast R. R. Co., 27 Pa. 339; Citizens Electric Illuminating Co. *v.* Lackawanna & Wyoming Valley R. R. Co., 255 Pa. 176; Connellsville & State Line Ry. Co. *v.* Markleton Hotel

Co., 247 Pa. 565; Woods *v.* Greensboro Natural Gas Co., 204 Pa. 606; Pennsylvania Telephone Co. *v.* Hoover, 209 Pa. 555; American Transfer Co.'s Petition, 237 Pa. 241. "The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court:" Northwestern Fertilizing Co. *v.* Hyde Park, 97 U. S. 659.

Nothing is shown in the charter of the Mountain Water Supply Company, or in the language of the legislation under which it was created, conferring upon it the right of eminent domain. The charter shows the corporation to have been "formed for the purpose of storing, transporting and furnishing of water, with the right to take rivulets and land, and erect reservoirs for holding water, for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom," which is in the language of the prevailing legislation, "and of acquiring all the rights, powers and privileges conferred upon corporations for said purposes, as described in the 18th paragraph of the 2nd section of the said Act of April 29, 1874, and the supplements thereto," under which act and its supplements it has been held, as already shown, that a corporation organized thereunder is not invested with the power of eminent domain.

Acting under an alleged power of eminent domain, the directors of the Mountain Water Supply Company, on March 22, 1902, passed a resolution to take and appropriate perpetually all the waters of Indian Creek at, above and flowing into said stream at the dams, intake and water-works of the company, on lands therein designated, and also the lands, for its corporate purposes. But even assuming that the corporation had the power of eminent domain claimed by it, the reservoir of the company was not built on the lands or at the point on the stream designated in that resolution, and it is not even pretended by plaintiffs that the company ever paid, or secured to be paid, to defendants or their predecessors in title any compensation therefor. On June 22, 1904, the directors of the corporation passed another resolution purporting to appropriate 506 acres of land at another location for the purpose of reservoirs, dams and spillways, abutting on Indian Creek, about five miles above the confluence of Indian Creek with the Youghiogheny River, the title to which land they afterwards acquired by purchase, and this is the land upon which their present reservoir was built.

It has been noted specifically in numerous decisions, one of the latest of which is Underwood *v.* Pennsylvania, Monongahela & Southern R. R. Co., 255 Pa. 553, that the successive steps necessary to vest title to land appropriated by a railroad company under its right of eminent domain are:

"(1) A preliminary entry on the land for the purpose of exploration and survey.

"(2) The selection and adoption of a line as and for the location of the proposed railroad by appropriate action of the company's board of directors.

"(3) Compensation made or secured by the corporation to the owner for the damages sustained by reason of the appropriation of the land."

As to a water company invested with the power of eminent domain, it will be conceded that the successive steps necessary to vest title in the corporation are:

1. Proper resolutions by the board of directors of the corporation definitely designating the property sought to be condemned.

3 D. & C.

DISTRICT AND COUNTY REPORTS. 215

Mountain Water Supply Co. et al. v. Sagamore Coal Co. et al.

2. Entry or location upon the ground.

3. Compensation made or secured by the corporation to the owner of the property affected.

It has been held, however, in that connection, that the legal formalities necessary for the condemnation of the water of a stream are sufficiently complied with when it appears that proper resolutions to condemn were duly adopted by the board of directors directing a location on the ground, which were followed by an actual location and formal acceptance thereof by the corporation and the payment of damages to the riparian owner: Boalsburg Water Co. v. State College Water Co., 240 Pa. 198.

In discussing the question as to whether or not the Mountain Water Supply Company has the power of eminent domain, counsel for plaintiffs in their brief say: "What does the act mean by the words 'with the right to take rivulets and land,' if it does not intend such property to be taken by the right of eminent domain? But all doubt on this question is answered by the proviso in the 4th clause of the 34th section of the Corporation Act of April 29, 1874, P. L. 73, as amended by the Act of June 12, 1879, P. L. 177," which proviso reads: "That companies organized for any of the purposes set forth in the 18th clause of the 2nd section of this act, whether such companies shall have been organized under any special act of assembly or under the general acts, in said 18th clause enumerated, and not having for their object the supplying of any village, borough or city with water, shall have all the rights, privileges and powers conferred by the said 18th clause; and the right to take lands, waters or rivulets shall be exercised in the manner provided in the 41st section of this act." But the amendatory act makes no change in the original act relative to the question now under consideration. The only words in the amendatory act not in the original act are "whether such companies shall have been organized under any special act of assembly or under the general acts in said 18th clause enumerated." Section 34 of the original Corporation Act referred to water and gas companies. The 1st clause of section 34 referred to gas companies only. The 2nd clause referred to water companies incorporated for the supply of water to the public, and enacted: "Where such companies shall be incorporated for the supply of water, they shall have power to provide, erect and maintain all works and machinery necessary or proper for raising and introducing into the town, borough, city or district where they may be located a sufficient supply of pure water, and for that purpose may provide, erect and maintain all proper buildings, cisterns, reservoirs, pipes and conduits for the reception and conveyance of water; and they are authorized and empowered, by themselves, their agents, engineers and workmen, and with their tools, carts, wagons, beasts of draft or burden, to enter upon such lands and enclosures, streets, lanes and alleys, roads, highways and bridges as may be necessary to occupy or to obtain materials for the construction of said works, and to occupy, ditch and lay pipes through the same, and the same from time to time to repair, subject to such regulations in regard to streets, roads, lanes and other highways as is provided in the foregoing section for gas companies; and if any injury be done to private property, the said company shall make compensation therefor in the manner provided in the 41st section of this act." The 3rd clause of the section referred to exclusive rights and privileges. The 4th clause then enacted: "Before any such water company shall proceed to occupy any land or enclosure, or to obtain and use any material therefrom for the purpose mentioned in this section, it shall be lawful for them to agree with the owner or owners thereof for the purchase of so much thereof as may be necessary, or as to the

amount of injury sustained thereby; but in case they cannot agree, proceedings shall be had as provided in section 41 of this act: Provided, that companies organized for any of the purposes set forth in the 18th clause of the 2nd section of this act, and not having for their object the supplying of any village, borough or city with water, shall have all the rights, privileges and powers conferred by said 18th clause; and the right to take lands, waters or rivulets shall be exercised in the manner provided in the 41st section of this act."

It may be that the draftsman of the act assumed that as among the "rights, privileges and powers" conferred upon water companies "by the said 18th clause" was the right of eminent domain, which, after the amendatory Acts of 1889, it was ruled by the Attorney-General and decided by the courts under paragraph 18 of section 2 of the Act of 1874, as amended by the Act of May 21, 1889, P. L. 259, was not conferred upon water companies incorporated thereunder, in which case the words of the last clause of the proviso with which we are dealing simply would be inoperative: York County *v.* Crafton, 100 Pa. 619. See, also, authorities on this question cited in Cambria & Clearfield Ry. *v.* Blandburg Water Co., 226 Pa. 402. It already has been noted that the words "and the right to take lands, waters and rivulets shall be exercised in the manner provided in the 41st section of this act" are contained, not in any enacting clause of the statute, but in a proviso, which in an act always is in limitation and never in enlargement of a previous general enactment: United States *v.* Dickson, 40 U. S. 141. And for that reason, also, the words used in this proviso are inoperative. The ruling of the Attorney-General in Portland Water and Power Co. *v.* Portland Water Co., 29 Pa. C. C. Reps. 180, was made so that both paragraphs 9 and 18 of section 2 of the Act of April 29, 1874, P. L. 73, and the acts amendatory thereof of May 16, 1889, P. L. 226, and May 21, 1889, P. L. 259, all might be administered together and all be made effective, and the decisions of the courts since then have been in harmony therewith. That was in accordance with the rule that statutes enacted at the same session of the legislature should receive a construction, if possible, which will give effect to each. They are within the reason of the rule governing the construction of statutes *in pari materia.* Each is supposed to speak the mind of the same legislature, and the words used in each should be qualified and restricted, if necessary, in their construction so as to give validity and effect to every other act passed at the same session. It was after the passage of the Act of June 12, 1879, P. L. 177, that the Attorney-General made his ruling above cited, and this particular act, among others, was cited in his opinion; and it was after the passage of that act that the Supreme Court decided the cases of Peifly *v.* Mountain Water Supply Co., 214 Pa. 340, and Jacobs *v.* Clearview Water Supply Co., 220 Pa. 388.

Giving to the language of the Mountain Water Supply Company's charter, which also is the language of the statutes under which it was incorporated, the broadest construction that can be placed on the words, and not taking into consideration for the moment the doubt as to, if not the actual prohibition of, such construction, the company was given the right only "to take rivulets and land." As noted earlier in this opinion, one of the things a water company exercising the power of eminent domain must do is to designate definitely in its resolutions the property it seeks to condemn. In none of its resolutions did the Mountain Water Supply Company designate any of the lands or property rights of any of these defendants, or of any of their predecessors in title. This company, therefore, if it claims to have taken the rights of defendants to drain their mine waters into Indian Creek under the law, must

3 D. & C.

have done so under its alleged appropriation of the waters of the stream perpetually "at, above and flowing into said stream at a point about five miles up the stream from the confluence of Indian Creek with the Youghiogheny River, where its dam or reservoir is located." That alleged appropriation was of the waters of the stream as they are found at the point where the reservoir is located, and as to defendants, riparian owners several miles above the reservoir, the stream flows as it always did, and, as such riparian owners, defendants are entitled to the uses of it just as they always have been. All the alleged appropriation purported to do was to take water. It did not purport to take any property rights of defendants, or their predecessors in title, as upper riparian owners.

By the Constitution of Pennsylvania, art. I, § 10, and art. XVI, § 8, it is provided that private property shall not be taken or applied to public use without authority of law and without just compensation being first made or secured, and that corporations invested with the privilege of taking private property for public use shall make just compensation for the property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction. Even if the Mountain Water Supply Company had been invested with a power of eminent domain broad enough to permit the company to deprive the defendants or their predecessors in title of their riparian rights on Indian Creek, and that power had been properly exercised, it would be ineffective as against the defendants or their predecessors in title, because, as against a private property owner, no right is acquired by the exercise of the power of eminent domain until compensation is paid or secured: Wheeling, Pittsburgh & Baltimore R. R. Co. v. Warrell, 122 Pa. 613; Lord v. Meadville Water Co., 135 Pa. 122; Williamsport & North Branch R. R. Co. v. Philadelphia & Erie R. R. Co., 141 Pa. 407; Graham v. Pittsburgh & Lake Erie R. R. Co., 145 Pa. 504; Gilmore v. Pittsburgh, Virginia & Charleston R. R. Co., 104 Pa. 275; Philadelphia, Newtown & New York R. R. Co. v. Cooper, 105 Pa. 239; Davis v. Southwest Pennsylvania Pipe Lines, 223 Pa. 56; Johnston v. Delaware, Lackawanna & Western R. R. Co., 245 Pa. 338; Speer v. Monongahela R. R. Co., 255 Pa. 211; Underwood v. Pennsylvania, Monongahela & Southern R. R. Co., 255 Pa. 553. In the case last cited it was said specifically by Mr. Justice Frazer that, although when the route of a railroad company has been surveyed, marked on the ground and adopted by an appropriate action of the board of directors of the corporation, the company has acquired a conditional title, good against rival corporations, but not as against the owner until compensation is made or secured to him, and, therefore, in case of a conveyance of the land during the period between the formal appropriation by the corporation and the payment or securing of compensation: "We conclude the only consistent rule is to hold that a claim for damages for taking land, in so far as the right thereto between the grantor and grantee of the land is concerned, arises when the damages are secured, and, therefore, accrues to the person who owns the land at the time such security is entered." See, also, Stahl v. Buffalo, Rochester & Pittsburgh R. R. Co., 262 Pa. 493.

It was suggested at the argument that, in any event, the defendants at this late day are estopped, on principles of equity, from draining the polluted waters from their coal mines into the waters of Indian Creek. Upon what grounds the doctrine of equitable estoppel can be invoked in this case we are unable to see. "One of the essentials of an equitable estoppel is that the conduct or representations of the person to be estopped induced action by the

other party:" Keefer v. Keefer, 9 Pa. Superior Ct. 53. "There is no doubt about the general principle on which the doctrine of estoppel rests. Having induced action by another on a belief in a given state of facts, it is unjust to permit him who induced the action to deny the facts and strip the action of the protection they would have afforded. But one who has not been misled cannot invoke this doctrine in his behalf. If the party who seeks protection by setting up an estoppel has not been misled, he is not entitled to the benefit of the doctrine. The rule is that one shall be estopped from alleging the truth only when his falsehood or his silence has induced action by the other party that would lead to loss except for the estoppel:" Sensinger v. Boyer, 153 Pa. 628. "It is essential to an estoppel that the party who asserts it has been misled:" Garvey v. Refractories Co., 213 Pa. 177. "Acts which do not amount to an unequivocal assertion of a fact inconsistent with the truth, and do not reasonably induce belief contrary to the truth, and consequent action based on that belief, cannot bind as an estoppel:" Silliman v. Whitmer & Sons, 11 Pa. Superior Ct. 243. "A waiver never occurs unless intended or where the act relied on ought in equity to estop the party from denying it:" Diehl v. Adams County Mutual Ins. Co., 58 Pa. 443. There is no evidence in this case that any waiver of their rights was intended by defendants, or that any act of theirs or their predecessors in title was relied on by plaintiffs. There is no evidence that any act of defendants or their predecessors in title induced any belief acted upon by plaintiffs. There is no evidence that plaintiffs were misled by any act or word or silence of defendants or their predecessors in title. There is no evidence of any conduct or representations on the part of any of the defendants or their predecessors in title which induced any action whatever on the part of the plaintiffs or any of them. On the contrary, the evidence shows that those interested in the building of the reservoir and water-works system had their attention called to and had full knowledge of the existence of the coal in the Indian Creek Valley before the work was commenced, but that, after giving consideration to the matter, they knowingly took a chance that the coal never would be opened and worked commercially to such an extent as to materially pollute the water of Indian Creek, and refused to purchase the coal when the opportunity to do so was offered them at very low cost.

Having reached the conclusion that the Mountain Water Supply Company is not a public corporation; that it possesses no power of eminent domain; that it has not condemned and taken by authority of law any of the rights and privileges of any of the defendants or their predecessors in title as riparian owners along the waters of Indian Creek, and has not paid or tendered compensation to any of them for any rights or privileges it may claim to have taken by an alleged power of eminent domain, we are of opinion that its legal status on Indian Creek is simply that of a riparian owner. "It must be conceded that the title of the appellant company was not acquired by an exercise of the right of eminent domain, but by voluntary leases from the owners. Hence, it follows clearly, under our well-settled decisions, that the right acquired under the leases, having been obtained from a riparian owner, has no greater dignity than the right of the riparian owner himself. It is just as clear that riparian owners have no ownership of running water, no right to divert and sell it to strangers for general use, and are limited in their own use of it to ordinary domestic purpose:" Philadelphia & Reading R. R. Co. v. Pottsville Water Co., 182 Pa. 418. "But that the rights of a riparian owner would justify the plaintiff in carrying water for miles out of its chan-

3 D. & C.

nel to supply the Borough of Ashland with water is a proposition so palpably erroneous that it would be a waste of time to discuss it:" Haupt's Appeal, 125 Pa. 211; Lord *v.* Meadville Water Co., 135 Pa. 122. "Besides, the Philipsburg Company never has condemned Cold Stream or any portion of it for the purposes of its charter, although the water supply for its customers has, since the establishment of its plant until the present time, been furnished from it. The Philipsburg Company, therefore, has, as against the Citizens Company, the position and rights of a lower riparian owner and nothing more:" Philipsburg Water Co. *v.* Citizens Water Co., 189 Pa. 23. "If, on the other hand, the waters of a stream in which riparian owners alone have an interest be polluted, the wrong or injury is a private one, for which the individual or individuals injured may have redress; and this is true whether the riparian owner be a private person or a water company which does not take the water from the stream under the right of eminent domain. The rights of such owners are the same:" Com. *v.* Yost, 197 Pa. 171. "It was contended upon the trial below, and it was urged here, that the proceeding should have been by a jury of view, under the Act of May 16, 1857, and not by a common law action. We do not regard that point as tenable, for the reason that the water was not taken by the company under the right of eminent domain, but by virtue of its rights as a riparian owner. As before stated, it owns the land in fee simple at the point where the water is taken, and has precisely the right of every other riparian owner on that stream. It may use the water as other owners use it without responsibility to any one therefor, provided such use is not of a character to injure other riparian owners on the same stream:" Pennsylvania R. R. Co. *v.* Miller, 112 Pa. 34.

### *The Dunbar Water Supply Company.*

The Dunbar Water Supply Company was incorporated Dec. 5, 1904, under the Act of April 29, 1874, P. L. 73, and the supplements thereto, for the following purpose, as set forth in its charter: "Said corporation is formed for the purpose of the supply of water to the public in Dunbar Township, Fayette County, Pennsylvania, and to such persons, partnerships and associations residing therein as may desire the same." The formation of the company was authorized by paragraph 9 of section 2 of the Act of 1874, and it was invested with the power of eminent domain under the authorities already considered.

On April 10, 1906, the company's board of directors adopted the following resolution: "*Resolved,* That the Dunbar Water Supply Company, in pursuance of and by virtue of its right of eminent domain in it vested, hereby permanently takes and appropriates to its use, the same being necessary for the purposes of its incorporation, the whole daily flow of the stream known as Indian Creek, in the Township of Springfield, County of Fayette, and State of Pennsylvania, and of the tributaries thereof flowing into the same at or above the place of diversion or intake of the water hereinafter mentioned, said water to be taken from said Indian Creek at the storage dam or reservoir established by Mountain Water Supply Company on said creek on the lands now of Joseph T. Bunting in said township, which point is located approximately five miles easterly of the confluence of said Indian Creek with the Youghiogheny River, and, further, that the officers of this corporation be and they are hereby authorized and directed to proceed in accordance with law to carry into effect the provisions of this resolution, to negotiate with the owners of riparian rights injured or to be injured by the taking and appropriation of the waters of Indian Creek or of the tributaries thereof as aforesaid, for the settlement by agreement of all damages resulting or to result

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

from the taking and appropriation of the water rights aforesaid, and for the release of said water rights, or failing therein, by proper proceedings in the manner provided by law for the taking and appropriation and condemnation thereof, and that the officers of this company be and they are hereby authorized and empowered to institute and carry on proper proceedings to this end, and to make, enter into, deliver, serve and file for and on behalf of this company, using the name, style and seal of this company for such purposes, all necessary agreements, undertakings, applications, bonds, petitions, notices and all other papers or legal instruments necessary or essential for the carrying out of the provisions of this resolution, and generally to do all other acts and things necessary or requisite in the premises."

The company never took any further action in pursuance of that resolution. It never entered upon Indian Creek or constructed any reservoir thereon. It built no pipe-line to carry the water away from the stream. It made no payment of and gave no security for compensation to any of the defendants or their predecessors in title. If it intended by its resolution to acquire any of the rights of the riparian owners along the stream, that purpose never was accomplished. It never took any water from Indian Creek. On the contrary, it became a purchaser of water under contract of Nov. 3, 1916, a copy of which is attached to the bill, from the Mountain Water Supply Company, which latter company, from its storage reservoir on Indian Creek and through its pipe-line therefrom, furnishes the water to the Dunbar Water Supply Company at a point at or near the Gibson Junction reservoir, thirteen miles away, in Connellsville Township, where the Dunbar Water Supply Company receives the water into a pipe-line held in its own name and carries it across the Youghiogheny River, through a part of Dunbar Township, to the right of way of the Pennsylvania Railroad Company, where it empties the water into the pipe-line of that company.

It is true the contract provides technically that the Dunbar Water Supply Company may divert from Indian Creek by means of the storage dam or reservoir of the Mountain Water Supply Company, and through the conduits and mains of that company, to a point at or near the Gibson Junction reservoir, a quantity of water therein specified, and that the Dunbar Water Supply Company agrees to pay to the Mountain Water Supply Company, during the term of the agreement, which is to run from year to year until terminated by notice, for the use of the Mountain Water Supply Company's storage dam in said diversion of said waters and for the transportation thereof through the mains and conduits of the latter company to the point at or near the Gibson Junction reservoir, a certain sum per gallon for the water so transported, to be measured at the point of connection of the mains of the two companies; and that the Mountain Water Supply Company shall furnish to the Dunbar Water Supply Company, monthly, during the continuance of the agreement, bills for the use of the conduits and mains of the Mountain Water Supply Company, measured by the amount of water so diverted and transported by the Dunbar Water Supply Company, as shown by meter. But the Dunbar Water Supply Company has no physical facilities of any kind for entering upon and taking water out of Indian Creek at any point, and holding it at any place, and supplying it to anybody anywhere. Although the company by its charter and the statutes under which it was organized was invested with the power of eminent domain for its corporate purposes, it never has taken any completed action in pursuance thereof, by virtue of which it acquired any of the riparian rights of any of these defendants, or their predecessors in title, or that otherwise in any manner affected any of them.

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

### The Pennsylvania Railroad Company.

The Pennsylvania Railroad Company was incorporated by Act of April 13, 1846, P. L. 312, and by that and subsequent acts has been invested with powers of eminent domain for certain purposes. But whether any of these acts gave the Pennsylvania Railroad Company the power under any circumstances to appropriate water and water rights for operating purposes under the privilege of eminent domain, it is not necessary now to decide, because it is not alleged in the bill, did not appear by the evidence, was not contended at argument, and has not been relied on at any stage of this proceeding, that the Pennsylvania Railroad Company ever made, or attempted to make, any legal appropriation of any part of the waters of Indian Creek for any of its corporate purposes: Cambria & Clearfield Ry. Co. *v.* Blandburg Water Co., 226 Pa. 402. The Pennsylvania Railroad Company acquired all the stock of both the Mountain Water Supply Company and the Dunbar Water Supply Company under the Act of April 22, 1905, P. L. 264, which provides: "That in order to enable railroad companies of this Commonwealth to secure an adequate supply of water for their necessary corporate purposes, they are hereby authorized, from time to time, to acquire, own and hold, pledge, sell or otherwise dispose of, the stock, bonds and other securities, or either, and to guarantee the stock, bonds and other securities, or either, of water companies." But the fact that the railroad company owns all the stock of both the plaintiff water companies does not, in our opinion, affect the legal status of the case in the respects now under consideration.

### Forms and realities.

In United States *v.* Reading Co., 253 U. S. 26, which was a suit entered by the Government to dissolve intercorporate relations existing between corporation defendants, for the alleged reason, among others, that through such relations they were violating the commodities clause of the Act of Congress of June 29, 1906, 34 Stat. at L. 584, by transporting over their lines of railroad, in interstate commerce, coal mined or purchased by coal companies with which they were associated by stock ownership, it was said by Mr. Justice Clarke: "It results that it may confidently be stated that the law upon this subject now is, that while the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two, such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist, and will deal with them as the justice of the case may require." Consequently, it must result that where the ownership by a railroad company of all the shares of the capital stock of water companies is resorted to, not for the purpose of participating in the affairs of the water companies in a manner normal and usual with stockholders, but for the purpose of making the water companies a mere instrumentality or department of the railroad company, the courts will look through the forms to the relalities of the relation between and among the companies, and will deal with them as the justice of the case may require.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

### The Westmoreland Water Company.

The Westmoreland Water Company was incorporated Sept. 24, 1886, under the name of the Westmoreland Water Company of Ludwick Borough, for the purpose of supplying water to the public in the Borough of Ludwick, in Westmoreland County; and nearly twenty-six years later, on May 21, 1912, by due corporate action, the name of the corporation was changed to Westmoreland Water Company. Other water companies, each organized for the purpose of supplying water to the public in the municipal division of Westmoreland County indicated by its name, were incorporated on the following dates: The Westmoreland Water Company of Unity Township, the Westmoreland Water Company of Hempfield Township, and the Westmoreland Water Company of Greensburg Borough, Sept. 24, 1886; the Penn Township Water Company, the Penn Borough Water Company, and the North Huntingdon Water Company, Aug. 10, 1887; and the Irwin Water Company, Feb. 14, 1889.

On April 27, 1904, the several water companies named, except the Irwin Water Company, whose like action was taken on May 19, 1904, adopted resolutions purporting to appropriate the waters of Indian Creek at a point in that creek upon lands of John W. McFayden, at or near the confluence of Indian Creek and the Youghiogheny River, the alleged appropriation by the companies named being in the proportions set forth in our 79th finding of fact.

On June 14, 1905, separate but similar bills in equity were filed in this court by these eight water companies against the Mountain Water Supply Company, whereby the plaintiffs sought to restrain the Mountain Water Supply Company "from taking, carrying away or diverting any of the waters of Indian Creek for any purposes whatever, . . . from damming, retarding, lessening or otherwise preventing or interfering with the free flow and full volume of the waters of said Indian Creek as the same heretofore and before defendant began its works and constructions has flowed and existed, . . . and praying that the defendant be compelled by a proper decree and process to remove any obstructions, dams, reservoirs, works or constructions placed or erected by it or its officers, agents, employees or servants in or upon said stream, which dam, retard, lessen or otherwise prevent or interfere with the free flow and full volume of the waters of the stream as the same heretofore and before defendant began its works and constructions has flowed and existed, or by which the waters of the stream are or may be taken, carried away or diverted." In these bills it was alleged "that defendant serves no public use, and, further, has no right or franchise in fact to dam, receive, hold, take, carry away and divert the waters of Indian Creek, either in whole or in part, for any purposes whatsoever." In its separate answers to the respective bills, the Mountain Water Supply Company "denies that there was at any time a good, valid or *bona fide* condemnation by the plaintiff of any of the waters of said stream," and alleged that the municipal districts in which the respective plaintiffs were authorized to supply water were from twenty-five to forty miles from the point on Indian Creek where the plaintiffs claimed to have appropriated the waters of the stream, and that the plaintiffs had taken no steps toward the construction of a pipe-line from said point on Indian Creek to said municipal districts, nor had it constructed nor begun to construct any dam, reservoir or intake on Indian Creek for the purpose of storing or diverting the waters thereof. Throughout the litigation it was contended by the plaintiffs in the bills that the Mountain Water Supply Company was but an adjunct or instrumentality of the Pennsylvania Railroad Company.

But before anything was determined or decided by the court, the parties

3 D. & C.

entered into an agreement between and among themselves, consented to by the Pennsylvania Railroad Company, by which their controversies were settled and the equity suits were terminated. In the written agreement, a copy of which appears in the present case as plaintiffs' Exhibit 10, and a copy of which also is attached to plaintiffs' printed bill, the equity suits are mentioned, and it is set forth that the parties entered into the agreement "with the object of avoiding further controversy and terminating and ending the litigation between them." The agreement is under date of April 27, 1910. The Mountain Water Supply Company is designated as "Supply Company," and the other companies as "Water Companies." It is stipulated in the agreement that for the term ending Dec. 31, 1934, Supply Company will furnish and deliver to Water Companies by gravity, and Water Companies will take the quantities of Indian Creek water therein specified, to be determined by meter, at the prices per thousand gallons therein mentioned, to be paid for at the times therein designated, and in the manner therein set forth, and "that the water to be furnished hereunder shall be delivered to Water Companies through the mains of Supply Company and the aforesaid line of pipe owned by the Pennsylvania Railroad Company, and in order to enable such deliveries to be made, connections shall be made between the said line of pipe of the Pennsylvania Railroad Company and lines of pipe of Water Companies" at the points in Westmoreland County, to which reference already has been made. It is stipulated that upon the giving of a notice therein required by Water Companies, the obligations of Supply Company to furnish and deliver and of Water Companies to take water shall be extended for the further term of twenty-five years, or until Dec. 31, 1959, subject to the same terms and conditions as during the original term, except that there shall be an increase from year to year in the minimum and maximum quantities of water to be so furnished and delivered, to be determined in the manner therein stated, and provided that in case of the extension of the original term Supply Company shall have the option of either continuing to make deliveries of the water at the points and in the manner provided for as to the original term, increased in quantity as aforesaid, or of making deliveries to Water Companies at the then existing dam or reservoir of Supply Company on Indian Creek, and that in the event of Supply Company electing to make deliveries at the dam or reservoir, Water Companies shall lay such lines of pipe as may be necessary to enable them to receive deliveries at that point. There is a provision in the contract that if for any reason whatever, legal or otherwise, beyond its control, Supply Company shall be unable or shall be prevented in any way from supplying Water Companies with the quantities of water to which they shall be entitled by the terms of the contract, or shall fail to furnish or maintain the storage facilities contemplated and provided for therein, Water Companies thereupon shall have the right to construct dams or reservoirs sufficient to retain and hold the waters of the stream that can be secured and developed through and by means of storage, and to take water therefrom for their uses, and it was agreed by Supply Company that in such case it will thereupon, on receipt of proper compensation therefor, grant to one or more of the Water Companies the right to lay said line of pipe, with its connections, and to construct reservoirs, under, upon and through lands which Supply Company then may own. Supply Company agreed to purchase, and Water Companies to sell, all lands abutting on or adjacent to Indian Creek or acquired by Water Companies for any purpose connected with the development of the waters of Indian Creek, at a price stated, and to deliver proper releases of any and all claims against

Supply Company for damages which, as owners or alleged owners of lands abutting on Indian Creek, they may have sustained, or may claim to have sustained, for or by reason of the taking and diversion theretofore of the waters of the stream by Supply Company. There was a provision in the contract that "nothing contained herein or in this agreement shall be taken to be a waiver or abandonment by Water Companies of their claim to have appropriated, by the exercise of the right of eminent domain, the waters of Indian Creek, or to invalidate their exercise of such rights as they may be entitled to assert in this connection, except so far as the same may be affected, as between the Supply Company and said Water Companies, by the terms of this agreement;" and a concluding paragraph that "should it become necessary or advisable at any time for the protection of the interests of the parties hereto to institute any legal proceedings or to take any other steps which may seem desirable to prevent the diversion by any other person, association or corporation of the waters of Indian Creek, or of its tributaries, or the pollution of the same, or to prevent any other interference with the rights and interests of the parties hereunder, Water Companies agree that they will, to the extent of their power and ability, join and co-operate with Supply Company in taking all steps that may be either advisable or necessary in the premises."

As early as Nov. 1, 1904, at No. 290, December Term, 1904, of this court, in the matter of exceptions to the approval of a bond of the Mountain Water Supply Company, not involved in this case, but the record of which has been offered in evidence, the exceptions challenged that company's power of eminent domain, but the proceeding was adjusted amicably, without a decision of the court being required.

On Dec. 26, 1913, all of the eight water companies named, except the first one, the name of which formerly was the Westmoreland Water Company of Ludwick Borough, now the Westmoreland Water Company, pursuant to due corporate action, conveyed and assigned all of their corporate franchises and all their property, real, personal and mixed, as is expressly authorized by section 5 of the Act of April 17, 1876, P. L. 30, and as was approved by the Pennsylvania Water Supply Commission, to the Westmoreland Water Company.

Neither the Westmoreland Water Company nor any of its constituent companies ever made any entry or location upon the ground in pursuance of the resolutions of condemnation, nor constructed any dam or reservoir for the impounding of the waters of Indian Creek at the point of diversion mentioned in the resolutions, which is five miles below the reservoir of the Mountain Water Supply Company, nor any facilities for the transportation of water; nor did any of the waters of Indian Creek ever come into the possession or under the control of any of these companies for nearly five years after the condemning resolutions were adopted, and until long after the equity suits were instituted, and near to the time of the subsequent settlement of that litigation by the contract of April 27, 1910; and the Westmoreland Water Company now owns no land or property or facilities for the utilization of water in the Indian Creek Valley watershed, or within twenty miles thereof. Neither the Westmoreland Water Company nor any of its constituent companies ever made or secured compensation to defendants in this case, or their predecessors in title, for anything. If any proceeding for the appropriation of the waters of Indian Creek, taken by the Westmoreland Water Company or any of its constituent companies, had the effect of taking, injuring or destroying any property or property rights of the defendants in this case, or

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

their predecessors in title, no compensation ever was paid or secured to the defendants, or to their predecessors in title, or to any of them. The settlement of the controversies between the Mountain Water Supply Company and the companies constituting what is now the Westmoreland Water Company, by their contract of April 27, 1910, does not in any way affect the defendants, and did not in any way affect their predecessors in title. The position of the Westmoreland Water Company in this litigation is simply that of a purchaser of water taken from the stream and impounded by a riparian owner.

Each of the water companies constituting what is now the Westmoreland Water Company was incorporated under paragraph 9 of section 2 of the Act of April 29, 1874, P. L. 73, and each of those companies had, and the Westmoreland Water Company has, the power of eminent domain. But none of these companies ever properly instituted, regularly exercised or successfully terminated any condemnation proceeding which in any way affected any of the defendants in this case, or their predecessors in title.

### The protection of water supplies.

By the Act of May 26, 1893, P. L. 158, relative to water companies incorporated for the purpose of supplying water to the public, it is enacted in section 2: "That any such water company shall be and is hereby empowered to acquire and hold, by purchase or condemnation, such lands along and contiguous to streams of water, or reservoirs, from which water is taken for public use, as may be necessary to preserve them from contamination: Provided, that no land shall be taken for the uses mentioned in this act until just compensation shall have been made for property taken, injured or destroyed, which shall be paid or secured before such taking, injury or destruction: And provided, further, that any owner of land along said streams shall have the use of the water for farming and domestic purposes, with free ingress and egress at all times to such streams." Both the Dunbar Water Supply Company and the Westmoreland Water Company are water companies incorporated for the purpose of supplying water to the public, but, so far as shown by the record in this case, neither of these companies ever has attempted to purchase or condemn land along and contiguous to Indian Creek for the purpose of preserving the Indian Creek water supply from contamination. As much land as is indispensably necessary and absolutely essential for the preservation of the water supply may be acquired and held by the water company, and such land is exempt from taxation. "If any local danger menaces the purity of the dams, reservoirs, streams or tributaries, there is ample protection furnished by the Act of 1893, by which the unsafe locality may be condemned and thus become technical corporate property exempt from local taxation. The case is not to be determined by the amount of acreage alone. No fixed rule can be laid down on that subject, as each case must be decided upon its special and characteristic facts:" Spring Brook Water Co. *v.* Kelly, 17 Pa. Superior Ct. 347.

### The Commonwealth of Pennsylvania.

The Commonwealth of Pennsylvania, by intervening, became a plaintiff on the record after the bill was filed. The question as to what interest it has in this proceeding must be considered and determined. Counsel for defendants have called the court's attention to several recent acts of the legislature which, they allege, indicate the policy of the State relative to mine drainage.

The Act of April 22, 1905, P. L. 260, entitled "An act to preserve the purity of the waters of the State, for the protection of the public health," provides,

in section 4: "No person, corporation or municipality shall place, or permit to be placed, or discharge, or permit to flow into any of the waters of the State, any sewage, except as hereinafter provided. But this act shall not apply to waters pumped or flowing from coal mines or tanneries."

The Act of April 27, 1905, P. L. 312, entitled "An act creating a department of health, and defining its powers and duties," in section 9, gives the Commissioner of Health power and authority to order nuisances, detrimental to the public health, or the causes of disease and mortality, to be abated and removed, and to enforce quarantine regulations, and provides how the orders of the commissioner shall be enforced, but at the end of section 9 appears this clause: "Provided, however, that this act shall not apply to waters pumped or flowing from coal mines or tanneries."

Section 16 of the Act of May 1, 1909, P. L. 353, which makes it a criminal offence for any person to allow any deleterious, destructive or poisonous substances of any kind or character to be turned into, or allowed to run, flow, wash or be emptied into any waters within the Commonwealth, unless it is shown to the satisfaction of the Commissioner of Fisheries, or the court, that every reasonable and practicable means has been used to prevent the pollution of the waters in question by the escape of deleterious substances, has been held not to apply to the pollution of a stream caused by the discharge of waters from a coal mine: Com. *v.* Miller, 43 Pa. C. C. Reps. 264; 25 Dist. R. 144.

The Act of June 27, 1913, P. L. 640, entitled "An act to preserve the purity of the waters of the State, for the protection of the public health and property," provides: "That from and after the passage of this act, it shall be unlawful for any person, partnership or corporation to place or discharge, or permit to be placed or discharged, in or into any of the running streams of this State any anthracite coal, anthracite culm, or refuse from anthracite coal mine, or to deposit any such coal, or culm, or refuse, upon the banks of such stream, where the same would be likely to slide into or be washed into such stream: Provided, however, that this act shall not apply to waters pumped or flowing from coal mines where the coal, or culm, or refuse have been removed therefrom."

By the Act of July 25, 1913, P. L. 1233, it was made the duty of the Water Supply Commission of Pennsylvania: "To make a complete inventory of all the water resources of the Commonwealth, and collect all pertinent data, facts and information in connection therewith; and to classify, tabulate, record and preserve the same; and, upon the basis thereof, to determine the points at which reservoirs may be constructed for the purpose of minimizing floods, of storing and conserving water for power, and other utilization and distribution of water and water power, of increasing the low-water flow of rivers and streams for the purpose of navigation; and, generally, to devise all possible ways and means to conserve and develop the water supply and water resources of the Commonwealth, for the use of the people thereof. To the end and object aforesaid, the said commission shall study, consider and determine upon a public policy with regard to the marketing and equitable distribution of the water to be derived from the water resources of the Commonwealth; to the restoration, development and improvement of transportation by water; to the supply of water for domestic and industrial use, and to the conservation of water resources by the aid of forestation. The commission shall present a report, in writing, to the next session of the general assembly, setting forth the result of such inventory, together with such recommendations and suggestions for legislation, upon the basis thereof, as to it may seem expedient and advisable."

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

Counsel for defendants say in their brief: "Notwithstanding all of these legislative considerations of the waters of the Commonwealth, there has been no legislation whatever against the pumping or flowing of bituminous mine water into streams. On the contrary, the legislature in at least three acts has recognized such right. There is no evidence in this case to show that the public in Indian Creek Valley is in any way whatever affected *as the public* by the drainage of mine waters into that stream. The case must be disposed of on the theory that there is no public injury or nuisance to the people in the valley through which the stream flows. The people affected by the corruption of the waters of the stream do not reside in or near the Indian Creek Valley, but at far distant points, located in a different watershed, who originally had no rights whatever in and to the waters of this stream, and who could not be directly or remotely affected by its purity or want of purity. If this distant public, resident within watersheds and districts far removed, have any rights in and to the waters of this stream, those rights must have been acquired and obtained, manifestly, in point of time, subsequent to the rights of the property owners in the Indian Creek Valley. When the Commonwealth first granted a patent for land bordering on Indian Creek, the patentee obtained certain rights in that stream, and at that time the inhabitants of Greensburg and vicinity had no rights therein. As long as the stream flowed and was permitted to flow in the course of nature, they had no such rights. There is no inherent right in the inhabitants of Greensburg, or any other part of the public, whatever their needs, to take the waters of a private stream, except by and through the exercise, by a public water company or a municipality, of a part of the sovereign power of the Commonwealth, specially vested in such company or municipality, and then only after compensation paid or secured. If the defendants were indicted for a nuisance in corrupting the waters of Indian Creek, at the suit of the Commonwealth, and the gravamen of the offence was alleged to be that the nuisance consisted in rendering the waters of Indian Creek unfit for use by the people of Greensburg, the right of the people of Greensburg to take and divert the waters of Indian Creek would be the primary and principal consideration."

In this connection, attention may be called to a paragraph in the petition of the Attorney-General for permission to the Commonwealth to intervene as a party plaintiff in this case: "2. That a petition has been filed with your petitioner, signed by some 1700 citizens of the Commonwealth of Pennsylvania, residents of the Counties of Westmoreland, Fayette, Washington and Allegheny, setting forth that the water supplied by the Mountain Water Supply Company is obtained from its reservoir maintained by it in the County of Fayette, in the watershed of the stream known as Indian Creek, which stream, above the reservoir, drains a section of the southeastern part of Westmoreland County and the northeastern part of Fayette County; that in recent years large quantities of mine water have been discharged into the streams tributary to the said Indian Creek, which have polluted the waters of Indian Creek and caused irreparable loss and damage to the public; that said pollution of the waters of Indian Creek is in violation of the rights of the public and prejudicial to the interests of the community; and praying the Attorney-General to intervene for the Commonwealth of Pennsylvania on behalf of the public." In so far as the record in the present case shows, the only water supplied by the Mountain Water Supply Company for public and domestic use, which is outside the purposes of its charter, is that furnished under private contract of April 27, 1910, to the companies now constituting the Westmoreland Water Company, which is engaged in supplying water to the pub-

lic in the municipal districts of Westmoreland County, known as the Boroughs of Greensburg, South Greensburg, Southwest Greensburg, Youngwood, Jeannette, Penn, Manor, Irwin and North Irwin, and the Townships of Unity, Hempfield, Penn and North Huntingdon. So far as shown by the record, none of the Indian Creek water is used for domestic purposes in Washington, Allegheny or Fayette Counties, unless it be small portions of that furnished to the railroad companies for their corporate purposes, and used by their employees for domestic purposes in the course of their employment. All the Westmoreland County municipal districts mentioned are near to or beyond the Borough of Greensburg, which is thirty-nine miles by route of the pipeline from the Mountain Water Supply Company reservoir on Indian Creek.

In Haupt's Appeal, 125 Pa. 211, already cited on another phase of this case, it was said by Mr. Chief Justice Paxson: "In the case of a river or public highway, all the people of the State have access to it, may ride over it and use the water. Not so with a private stream. In such case no one can use it or take water except at a public crossing. There the traveler may stop, refresh himself and water his horse; the water has no owner, and he impairs no man's right. But except at public crossings, such as a road or a street, no one but a riparian owner can use the water; not because the latter has any ownership in it, but because the stranger has no right of access to it." Even when a corporation clothed with the right of eminent domain takes the water of a stream for its corporate use, not by an exercise of its right as such, but by virtue of its right as a riparian owner, it has no other or higher right in the water than an ordinary riparian owner, and it matters not what the needs of its business are for the waters so used: Philadelphia & Reading R. R. Co. *v.* Pottsville Water Company, 182 Pa. 418. "The purchase of the acre of land, including the spring, gave the company the rights of a riparian owner. But such rights were not a justification for the diversion of the water from its natural course to supply the City of Meadville:" Lord *v.* Meadville Water Co., 135 Pa. 122.

It is urged by counsel for defendants that unless there has been a legal condemnation of the waters of Indian Creek, by a water company invested with the power of eminent domain, and the waters thereby dedicated to a public use, the Commonwealth has no interest which affords it a right to maintain this bill as a party plaintiff. That argument is based on the decision of the Supreme Court in Com. *v.* Yost, 197 Pa. 171, which we think determines that question in favor of defendants. Yost was indicted for maintaining a nuisance in permitting sewage from his premises to drain into a small watercourse flowing into the south branch of Codorus Creek, on which the York Water Company had a pumping station twelve or thirteen miles below Yost's premises, from which it pumped the polluted water and supplied it to its customers in the City of York for drinking and domestic purposes. Yost was acquitted by the jury, and the Commonwealth appealed. When the case reached the Supreme Court, Mr. Justice Brown, in disposing of it, said: "If the public, having a right to take from this stream pure and unpolluted water, found in it the germs of disease coming from the cesspool of the defendant, which he maintained on a tributary to the stream, his offence would be a public one, for which he would be properly indicted. The wrong would be against the whole community, as a community—not simply against an individual or certain individuals, however numerous—and ought to be punished as a crime. If the public have a right to receive pure water through the agency of a corporation legally authorized to take it from a stream, he who pollutes it offends

3 D. & C.

against the public. If, on the other hand, the waters of a stream in which riparian owners alone have an interest be polluted, the wrong or injury is a private one, for which the individual or individuals injured may have redress; and this is true whether the riparian owner be a private person or a water company which does not take the water from the stream under the right of eminent domain. The rights of such owners are the same: Lord v. Meadville Water Co., 135 Pa. 122; Philadelphia & Reading R. R. Co. v. Pottsville Water Co., 182 Pa. 418. No evidence was offered by the Commonwealth showing use by any one of the water of the stream, except that by the York Water Company. There was no proof that this company possessed, and certainly none that it had ever exercised, the right of eminent domain in pumping the water. The proof was simply that it was a riparian owner on the south and west branches of the Codorus Creek, and had erected a pumping station on the former in the year 1896, from which alleged impure water was pumped. It is true that for very many years this company had pumped water from the Codorus Creek below the confluence of the south and west branches, but in the exercise of what right it did not appear; and nothing that it may have so done for upwards of fifty years at a point a considerable distance below, in the main stream of the Codorus, would, in itself, give it any rights superior to those of adjoining riparian owners at its pumping station on the south branch of the creek. Its rights were, under the evidence produced, as already stated, simply those of an ordinary riparian owner, having no ownership in the running water and no right to divert or sell the same for general use, whether pure or impure. As an individual it could complain of the alleged pollution of the water by the defendant, and any wrong done was done to it, and it alone, for which there was a civil remedy. If it actually had the right to divert and sell the water from the stream for general and public use, the Commonwealth was bound to show such right. The defendant was in a criminal court and nothing was to be presumed against him. Before he could be convicted of any offence against the public, it was the duty of the Commonwealth to show that he had offended against the rights of the public. No such offence was proven, no right of the public to use the water pumped by the York Water Company was shown. If anything was proven on the trial, it was that a riparian owner, the York Water Company, had undertaken to divert and sell water, alleged to have been polluted by the defendant, from the south branch of the Codorus Creek, which was not even shown to have been a public stream. In the absence of any proof that it had the right to do so, such right, in a prosecution of this kind, we repeat, cannot be presumed. The case, as presented to us for review, is one in which the waters of a stream may have been polluted by the defendant and were pumped out by a riparian owner for general use, but without any right on its part to so take and dispose of it. The wrong done by the defendant, if any, was to such riparian owner, the York Water Company, in depriving it of the use of pure water for ordinary domestic purposes, and any wrong committed was a private one, for which the remedy was purely civil. . . . The defendant was acquitted by the jury, after having been directed by the court to pass upon the question of his guilt. They should have been told to acquit him, and the ninth point submitted by him should have been affirmed. The facts in evidence were either admitted or undisputed, and having been insufficient to establish the guilt of the defendant as charged, it was the duty of the court, on request, to direct a verdict of not guilty."

The principle established in that case is not rendered inapplicable to the proceeding now before us by the fact that the decision there was in a criminal

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

prosecution. Nor is it affected by the later cases of Com. *v.* Ashley Borough, 37 Pa. Superior Ct. 254; Com. *v.* Emmers, 221 Pa. 298; Dixon *v.* Sheffer, 46 Pa. Superior Ct. 452; Com. *v.* Kennedy, 240 Pa. 214, because those cases arose under the provisions of the Acts of April 22, 1905, P. L. 260, and April 27, 1905, P. L. 312, relative to the disposal of sewage, and the powers of the Department of Health, each of which acts, as noted earlier in this opinion, contains a provision that the act shall not apply to waters pumped or flowing from coal mines. In the opinion in each of these cases the Yost case is referred to, and in Com. *v.* Kennedy, 240 Pa. 214, in referring to the Yost case, Mr. Justice Stewart said: "We put our refusal to sustain the conviction of the defendant distinctly on the ground that the only circumstance shown indicating that the offence was a matter of public concern was that a riparian owner, a water company, some twelve miles below the point where the sewage entered the stream, without ownership in the running water, and, therefore, without right to divert it, was, for commercial purposes, supplying it for general use. We held that the wrong done by the defendant, if any, was to such riparian owner in depriving it of pure water for its own legitimate purposes, and that any wrong so done was a private one, for which the remedy was purely civil. We did there say that, 'If the waters of a stream, in which riparian owners alone have an interest, be polluted, the wrong or injury is a private one.' As an abstract proposition this was entirely correct at the time we said it, and it is equally correct now, except as the State by recent legislation, in the exercise of its police power in the interest of the public, has resumed in one important particular, and for a definite purpose, its control of all the flowing waters of the Commonwealth, and, in consequence, the riparian owners, because of this exercise of power by the State, can no longer be said to be alone interested. It cannot be a matter of public concern that a stream, from which the public are excluded by the riparian owners, has been rendered unfit for domestic use. When this happens, the riparian owners alone are injured, and they alone can complain. Water pumped from coal mines and tanneries, if allowed to drain into a running stream, will pollute, and may work serious damage to riparian owners by rendering the water too unclean for domestic use; but so long as the injury is so confined, the public is not prejudiced and are without ground of complaint. In all such cases, and many others might be enumerated, it is perfectly correct to say that the riparian owners alone have an interest in the waters of the stream to be protected. But, in view of the recent legislation to which we have referred, the matter takes on an entirely different aspect when it is sewage that is discharged into a running stream. Because sewage is the most efficient medium for the dissemination of infecting germs, which do their deadly work in such an infinite variety of insidious ways, not at all dependent upon free access of the public to the stream which the germs pollute, it cannot be said that the riparian owners alone have an interest in the stream."

Counsel for plaintiffs cite, and place much reliance on, Com. *v.* Russell, 172 Pa. 506, and the decision of Judge Criswell in Com. *v.* Hanratty, 60 Pitts. L. J. 13. In each of these cases the Butler Water Company, a corporation organized under the General Corporation Act of 1874 for the purpose of supplying water to the public in the Borough of Butler, was attempting to restrain the defendants from draining salt water from their oil wells into the stream from which the water company took its supply of water for the inhabitants of Butler Borough, and in each of the cases the Commonwealth, by its Attorney-General, was on the record as a party plaintiff. Apparently, the water company had exercised its power of eminent domain in taking the

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

waters of the stream, and lands for the erection of its dams and reservoirs, for its corporate purposes, and had made or secured compensation therefor to the riparian owners. In the Hanratty case, Judge Criswell made special reference to some of these proceedings, and said that while there was nothing to indicate the extent of the company's appropriation, except the records referred to, together with proof of the fact that for many years there had been an open appropriation of the waters of the stream, and that there then was no complaint concerning such appropriation by any one having status to object thereto, "the plaintiff company must, therefore, be regarded as in the lawful exercise of its rights in using the waters of Connoquenessing Creek to supply the inhabitants of the Borough of Butler with water in pursuance of its corporate duty." Proceeding on that theory, the injunction prayed for was awarded. Judge Criswell has presided at times in this court, and we have very great respect for his opinion in any case, and on the basis mentioned, there is nothing in his opinion in the Hanratty case in conflict with the conclusion we entertain on the point now under consideration. Nor does anything contrary to our view appear in the Russell case. In writing the opinion of the Supreme Court in that case, Mr. Justice Williams apparently proceeded on the theory that the water company had exercised its right of eminent domain, because, in stating some of the questions to be considered in the court below on rehearing, he said: "Among other subjects to be examined and passed upon are these: What was the situation of the valley or basin of the Connoquenessing when the water company appropriated the stream for the supply of Butler Borough?" And then many different subjects of inquiry were suggested, and, inasmuch as the lower court had denied the Commonwealth, which had intervened in behalf of the public, the right to be heard, the decree dismissing the bill was reversed and the record was remitted for further proceedings in accordance with the opinion of the Supreme Court. What the Supreme Court wanted was findings of fact and conclusions of law on the questions suggested before passing final judgment thereon. The case never reached the appellate court again, and it is supposed it was settled in some way satisfactory to the parties concerned. The case of Blymer *v.* Butler Water Co., 172 Pa. 489, is a companion case to the last two mentioned, but it sheds no light on the subject now encountered.

### The balancing of the equities.

The equities of the case are with the defendants. Every man has a right to the natural use and enjoyment of his own property, subject only to the rights of others to the natural use and enjoyment of their properties. When the rights of persons in these respects come into conflict, they must be determined by rules of law and equity.

As already seen, the owner of land in a watershed has certain rights in the streams which constitute its natural drainage, which are property inherent in and appurtenant to the ownership of the land, among which is the right to permit water to flow by gravity into the streams from openings made in the land for the mining of coal, subject only to three limitations: 1. It must be done without malice. 2. It must be done without negligence. 3. It may not be done if an avoidable loss and damage thereby will be inflicted upon another's property.

We are not without authority as to how to determine whether the loss or damage likely to be done to the property of another is avoidable or unavoidable. The injury is avoidable if it be preventable by a reasonable expenditure of money. And we are not without authority as to what constitutes a reason-

able expenditure. If the expense of preventing the damage from the contemplated act is such as practically to counterbalance the expected profit or benefit, then it is clearly unreasonable, and beyond what the party justly can be called upon to assume. If, on the other hand, however large in actual amount, it is small in proportion to the gain to himself, it is reasonable in regard to his neighbor's rights. Between these two extremes lies a debatable region where the cases must stand on their own facts, under the only general rule that can be laid down in advance, that if the expense required will so detract from the purpose and benefit of the contemplated act as to be a substantial deprivation of the right to the use of one's own property, the result will be *damnum absque injuria:* Pfeiffer *v.* Brown, 165 Pa. 267.

There is no denial in the evidence of the fact that the drainage of the mine water from the mines of the defendants into Indian Creek will injure the waters of the stream for both domestic and industrial uses. That was conceded throughout the trial of the case. The real question around which all the evidence and arguments centered was as to whether the plaintiffs or the defendants must be at the burden and expense of removing the impurities from the water. As set forth in our 45th finding of fact, only three methods have been suggested in the evidence for the treatment of the mine water by the defendants:

*(a)* Separate treatment by each operator of the water coming from his own mine at the mine.

*(b)* The construction of a conduit system by which to collect the waters of all the mines and conduct them down the stream to a point below the reservoir and there discharge them into the stream.

*(c)* To collect all the waters from all the mines by a conduit system and conduct them to a central treatment plant, either below or above the reservoir.

For the reasons appearing in the evidence, any of these methods would be impracticable from the standpoint of the successful operation of the mines. In addition to that, a requirement that the operators of the mines must remove the sulphuric acid from the mine water before it reaches and commingles with the waters of Indian Creek would be to require of them an unreasonable expenditure. Under the evidence, it would mean a closing of the mines, and practically a loss to the defendants of their coal properties. On the other hand, it would be entirely feasible and practicable for the water companies, and the railroad company with which they are associated and connected, by chemical treatment or filtration, or both, to remove the impurities from the water as it is taken from the reservoir, or at some other convenient point, before it is distributed for either domestic or industrial uses. This would require of the plaintiffs the expenditure of large sums of money, but not an unreasonable expenditure, in light of the broad and varied uses made of the Indian Creek waters by the plaintiffs, the profits and benefits to be derived by them therefrom, the great need for a sufficient supply of water of good quality for a great railroad system, and the capacity of the waterworks plant already established, by which the waters of Indian Creek are rendered available to the plaintiffs.

It must be kept in mind, also, that the waters of Indian Creek already are polluted with pathogenic bacteria, not coming from the mine water, the burden of removing which is or will be on plaintiffs as the water is supplied for domestic purposes, facilities for the removal of which, and those for the removal of the sulphuric acid from the waters of the stream, may be used together economically. Counsel for plaintiffs in their brief designate the plaintiff railroad company as "the greatest industrial division of railroad in

3 D. & C.

the world," and counsel for the defendants, in discussing in their brief the matter of the expense to the plaintiffs in treating the water, say that "this expense will not be unreasonable or burdensome, in view of the extensive railroad system operated by the use of these waters," both of which statements we think are true.

## Conclusions of law.

Our conclusions of law are as follows:

1. The drainage by the defendants of the water accumulating in their mines into Indian Creek, or its tributaries, in the manner shown by the evidence, is a proper and natural use of their lands and constitutes a right of property.

2. The right of the defendants to drain their mine water into Indian Creek, or its tributaries, in the manner shown by the evidence, is a right of property of which the defendants cannot be deprived except by due process of law.

3. The nature, character and powers of the Mountain Water Supply Company must be determined from its charter, and not otherwise.

4. The Mountain Water Supply Company is a private, not a public, corporation, and has no power of eminent domain.

5. The Mountain Water Supply Company not having the power of eminent domain, and not having paid or secured compensation to the defendants, or to their predecessors in title, no part of the property or property rights of any of the defendants, or of their predecessors in title, ever has been lawfully appropriated and taken by that company.

6. The Mountain Water Supply Company not having the power of eminent domain, and not having paid or secured compensation to the defendants, or to their predecessors in title, its rights to the use of the waters of Indian Creek are but the rights of an ordinary riparian owner.

7. As a mere riparian owner on Indian Creek, the Mountain Water Supply Company has no standing in this proceeding to enjoin the defendants from permitting the waters from their coal mines to flow into Indian Creek.

8. The Mountain Water Supply Company is not suing as a riparian owner.

9. No part of the property or property rights of any of the defendants, or of their predecessors in title, ever has been lawfully appropriated and taken by the Dunbar Water Supply Company by the exercise of the right of eminent domain invested in it by its charter.

10. Each of the subsidiary water companies now constituting the Westmoreland Water Company was invested by its charter with the right of eminent domain, with authority to appropriate and take the waters of streams for its corporate purposes, and upon the consolidation of those companies into the Westmoreland Water Company, that company was invested with the right of eminent domain, with like authority.

11. The Mountain Water Supply Company not being invested with the power of eminent domain, but occupying the position merely of a riparian owner, the alleged public interest in and public use of the waters of Indian Creek by the Westmoreland Water Company, or its customers, is not to be determined by the character of the use actually made by them of the waters of Indian Creek, but by the fact as to whether or not the waters of Indian Creek have been lawfully appropriated and taken by the Westmoreland Water Company, or by any of its constituent companies, under the power of eminent domain.

12. No part of the property or property rights of any of the defendants, or of their predecessors in title, ever has been lawfully appropriated and taken

234        DISTRICT AND COUNTY REPORTS.

Mountain Water Supply Co. et al. v. Sagamore Coal Co. et al.

by the Westmoreland Water Company, or by any of its constituent companies, under the authority of a right of eminent domain.

13. The evidence as to the use of the waters of Indian Creek by the Westmoreland Water Company, or any parties supplied by it, does not strengthen the rights of the plaintiffs or any of them.

14. Under the facts disclosed by the record, the Westmoreland Water Company is, and its constituent companies since 1910 were, in so far as this case is concerned, nothing more than purchasers of water from the Mountain Water Supply Company.

15. The appropriation and taking of the waters of Indian Creek by any of the plaintiffs under an alleged power of eminent domain did not constitute a taking, injury or destruction of the rights of the defendants, as owners or operators of bituminous coal mines, situate above the point of diversion established by such alleged appropriation and taking, to permit the waters from their mines to flow by gravity into the stream.

16. The exercise of the power of eminent domain by any of the corporations connected with this litigation having such power is not complete and does not constitute the devotion of the waters of Indian Creek to a public use, as against any of the defendants whose property is alleged to have been taken, injured or destroyed, unless and until compensation has been paid or secured to the owner for the injury occasioned by such taking, injury or destruction.

17. Where the ownership by a railroad company of all the shares of the capital stock of water companies is resorted to, not for the purpose of participating in the affairs of the water companies in a manner normal and usual with stockholders, but for the purpose of making the water companies a mere instrumentality or department of the railroad company, the courts will look through the forms to the realities of the relation between and among the companies, and will deal with them as the justice of the case may require.

18. The properties, the legal title to which is vested in the Mountain Water Supply Company, were so constructed and are so operated and maintained, and the company's business and affairs have been and are so conducted, that the company is not a bona fide independent functioning corporation, but is a mere department or instrumentality of the Pennsylvania Railroad Company, and its properties are merely facilities of that railroad company.

19. The pipe-line, the legal title to which is vested in the Dunbar Water Supply Company, was so constructed and is so operated and maintained, and the company's business and affairs have been and are so conducted, that the company is not a bona fide independent functioning corporation, but is a mere department or instrumentality of the Pennsylvania Railroad Company, and its pipe-line is merely a facility of that railroad company.

20. The evidence does not show such a public interest in, or public use of, the waters of Indian Creek as to entitle the Commonwealth of Pennsylvania to maintain this bill as an intervening plaintiff in the cause.

21. Under all the evidence, the plaintiffs have no legal or equitable right which justifies the relief sought by the bill.

22. Under all the evidence, the Westmoreland Water Company has no legal or equitable right which justifies the relief sought by its bill.

23. The granting of an injunction against the defendants, as prayed for, would deprive them of their rights without due process of law, contrary to the provisions of the Constitution of Pennsylvania and the Constitution of the United States, and particularly the 5th and 14th Amendments to the Constitution of the United States.

3 D. & C.

Mountain Water Supply Co. et al. *v.* Sagamore Coal Co. et al.

*Decree.*

And now, Dec. 26, 1922, the injunction prayed for in the bill is refused and the bill is dismissed, at cost of plaintiffs; this decree to be entered *nisi* according to rule.

NOTE.—On April 30, 1923, exceptions of plaintiffs to the court's findings of fact and conclusion of law, and to the answers by the court to plaintiffs' and defendants' requests for findings of fact and conclusions of law, and to the decree of the court *nisi*, were overruled and dismissed, and the *nisi* decree was confirmed and made absolute.

From Luke H. Frasher, Uniontown, Pa.